[No. 2,914.]

# GEORGE HAGAR *v*. BOARD OF SUPERVISORS OF YOLO COUNTY.

PRESUMPTION AS TO RIGHT OF COMPANY TO HOLD LANDS.—When it appears, in the course of a judicial proceeding, that land has been conveyed to a company by a company name, as " The Sacramento Valley Reclamation Company," and there is an absence of all proof as to whether the company is a corporation, or capable in law of taking and holding lands, it will be presumed that the company was capable in law of taking and holding real estate.

WHEN CERTIORARI WILL BE DENIED.—In certiorari to review the proceedings of a Board of Supervisors in organizing a district for the reclamation of swamp lands, if it appears that the petition to organize the district was defective, on account of not stating with precision what lands in the district had been sold, yet, if the petitioner for the writ appeared before the Board and did not raise the objection, and waited several months before applying for the writ, and mischievous consequences might follow from a reversal of the proceedings, the Court will dismiss the writ.

IDEM.—Certiorari ought not to be granted, even if the record, when returned, appears to be defective or informal, provided substantial justice has been done, or if ruinous consequences would follow a reversal of the proceedings, and parties cannot be placed in *statu quo*.

ESTOPPEL IN CERTIORARI.—When, on an application before a Board of Supervisors to organize a district for the reclamation of swamp lands, a person whose lands are included in the proposed district, at the hearing, files a protest, because his lands are held under a Mexican grant, but admits that the lands are swamp and overflowed, he is estopped, on certiorari to review the proceedings of the Board, from denying that the lands are swamp and overflowed.

TITLE OF A STATUTE.—In construing statutes, resort is sometimes had to the title, as tending to throw some light upon the intention of the Legislature, in very doubtful cases; but, in any case, it is entitled to but little weight, and is never allowed to enlarge or control the language in the body of the act.

ACT OF 1868 FOR RECLAIMING SWAMP LANDS.—The Act of 1868 (Stats. 1867–8, p. 514), which provides for the reclamation of swamp and overflowed lands, is not limited to swamp and overflowed lands acquired by the

State under the Arkansas Act, but applies to all swamp and overflowed lands in the State, even if the title was derived from a Mexican grant.

POWER OF LEGISLATURE.—The Legislature has the constitutional power to compel local improvements, which, in its judgment, will promote the health of the people and abate nuisances, and it may open canals for irrigating arid districts, and build levees for draining lands, and impose local assessments to pay for such works.    .

CONSTITUTION OF A STATE.—The constitution of a State is not a grant, but a limitation of power, and when an Act of the Legislature is called in question as repugnant to the constitution, those who call it in question, must point to the provision in the constitution which has been violated.

ASSESSMENTS FOR LOCAL IMPROVEMENTS.—The authority to compel local improvements, at the expense of those to be immediately benefited, is not taxation.

CLAUSES IN CONSTITUTION ABOUT LOCAL IMPROVEMENTS.—Those clauses in the constitution which provide that taxation shall be equal and uniform, and prescribe the mode of assessment, and the officer by whom it shall be made, and that all property shall be taxed, have no application to assessments levied for local improvements.

RECLAMATION OF SWAMP LANDS.—The Legislature has the constitutional power to provide for the reclamation of all the swamp and overflowed lands in the State, whether the title has been acquired under the Arkansas Act, or from Mexican grants, and to assess the land reclaimed, to pay for the expense incurred.

CERTIORARI from the Supreme Court to the Board of Supervisors of Yolo County.

By the Act of the Legislature of this State, passed March 28th, 1868, it was provided that whenever holders of certificates of purchase, patents, or other evidences of title, representing one half or more of any body of swamp and overflowed land susceptible of one mode of reclamation, desired to reclaim the same, and should present to the Board of Supervisors of the county, a petition, setting forth that they desired to adopt measures to reclaim the same, the Board of Supervisors should hear and approve the same, and that the petitioners should elect three of their number as a Board of Trustees, and that the Trustees should employ engineers and others to survey and estimate the expense, and that the Board of Supervisors should appoint three Commissioners, who should assess upon each acre of land to be reclaimed, a tax proportionate to the whole expense, etc.

Under this Act the following petition was presented to the Board of Supervisors of Yolo County:

"*To the Board of Supervisors of Yolo County, State of California:*

"The undersigned present this petition, and respectfully show:

"That they desire to adopt measures to reclaim the body of swamp and overflowed lands described in the schedule hereto annexed, and for that purpose to form a district to include the same. A description of the lands your petitioners propose to reclaim is set forth by township, range, section, and subdivision of section in the said schedule. The number of acres in the whole district is seventy-four thousand and eighty-five and eighty-seven hundredths (74,085.87) acres, of which your petitioners are holders of certificates of purchase from the State of California and other evidence of title to forty-two thousand two hundred and seventy-nine and eighty-seven hundredths (42,279.87) acres, being and representing more than one half of all the lands within the proposed district. That the lands included within the limits of the proposed district are situated in Yolo and Colusa counties, of which forty thousand eight hundred and five and thirty-five hundredths (40,805.35) acres are situated in Yolo County, and thirty-three thousand two hundred and eighty and fifty-two hundredths (33,280.52) acres are situated in Colusa County. That the schedule annexed states the several tracts of land in the said district, the number of acres in each tract, and the names of the owners thereof, so far as known. And that the said body of land is susceptible of one mode of reclamation.

"Wherefore, your petitioners pray that after due publication of this petition according to law, and the hearing of the same on a day to be fixed by your honorable body, you will grant the same and allow the formation of the said district.

"THE SACRAMENTO VALLEY RECLAMATION CO.,
By WM. BLANDING, President;
LOUIS A. GARNETT,
A. H. ROSE,
CHAS. F. REED."

The schedule annexed to the petition covered several printed pages, and embraced the land in several townships.

Statement of Facts.

The following is a copy of the same so far as one township is concerned, which is sufficient to show what it contained:

SCHEDULE.

*Township* 11 *North,* 1 *East, Mount Diablo Meridian.*

| Sec. | Owner. | Subdivision. | Acres. |
|---|---|---|---|
| 11 | A. H. Rose............ | N E ¼.............. | 160 |
| 2 | ..... do.............. | Whole ..... .......... | 640 |
| 3 | ..... do.............. | E ½................ ... | 320 |
| 3 | ..... do........,----- | E ½ of N W ........... | 80 |
| 3 | ..... do.............. | N W ¼ of N W ¼....... | 40 |
| 12 | L. A. Garnett ........ | N ½................ | 320 |
| 12 | ..... do.............. | N ½ of S W ¼ ....... | 80 |
| 12 | ..... do.............. | N ½ of S E ¼......... | 80 |
| 1 | ..... do.............. | Whole ... .......... | 640 |
| 12 | A. J. Downs.......... | S ½ of S W ¼ ......... | 80 |
| 11 | I. F. Mason........ ... | S E ¼............... | 160 |
| 5 | Henry Clawson..... | N E ¼ of S E ¼........ | 40 |
| 4. | Sac'to Valley Reclam. Co. .............. | N W ¼............... | 160 |
| 4 | .... do.............. | W ½ of N E ¼........ | 80 |
| 3 | ..... do.............. | S W ¼ of N W ¼ ..... | 40 |
| 4 | ..... do.............. | E ½ of N E ¼ ......... | 80 |
| 5 | ..... do.............. | W ½ of N E ¼........ | 80 |
| 5 | ..... do.............. | N W ¼ of S E ¼ ...... | 40 |
| 5 | ..... do.............. | N W ¼.............. | 160 |
| 5 | ..... do.............. | N ½ of S W ¼ ........ | 80 |
| 6 | ..... do ............. | N E ¼.............. | 160 |
| 6 | ..... do.............. | E ½ of S E ¼........ | 80 |
| 6 | ..... do.............. | N W ¼ of S E ¼....... | 40 |
| 6 | ..... do.............. | W ½ of N W ¼........ | 80 |
| 6 | ..... do............. | N E ¼ of N W ¼........ | 40 |
| 11 | Fdk. Bonegman ...... | N W ¼.............. | 160 |
| 10 | John Roth ........... | N ½ of N E ¼ ......... | 80 |
| 11 | Louis Gauthier....... | S W ¼.............. | 160 |
| 5 | H. H. Burr .......... | E ½ of N E ¼........ | 80 |
| 4 | C. F. Reed.......... | N W ¼ of S E ¼........ | 40 |
| 3 | T. W. Strowbrige..... | N E ¼ of S W ¼........ | 40 |
| 12 | Unknown . ......... | S ½ of S E ¼.......... | 80 |
| 13 | ..... do.............. | N E ¼ of N E ¼ ....... | 40 |

An opinion in the case was delivered at the January Term, 1873, by which the proceedings of the Board were

annulled. A rehearing was granted on the application of the respondent.

The other facts are stated in the opinion.

*George Cadwalader* and *W. C. Belcher*, for the Petitioner, argued that the proceedings were void, because the tax was levied by Commissioners, and not by Assessors elected by the people; and cited *People* v. *Hastings*, 29 Cal. 450, and *Reily* v. *Lancaster*, 39 Cal. 359. They also argued that the petitioner's land, having been a Mexican grant, could not be included in a swamp land district, under the act of 1868, and that the State had no power to include in a swamp land district land acquired by a Mexican grant; and on this last point cited *Teschemacher* v. *Thompson*, 18 Cal. 11, and *Kimball* v. *Reclamation Fund Commissioners*, 45 Cal. 344.

*J. C. Ball, J. P. Hoge, William Blanding* and *J. R. McConnell*, for the Respondents, argued that it was within the power of the Legislature to provide for the reclamation of all swamp and overflowed lands, and assess the expense on the land benefited, and cited, *Town of Guildford* v. *Cornell*, 18 Barb. 632; *The People* v. *Mayor of Brooklyn*, 4 Comstock, 427; *Litchfield* v. *Vernon*, 41 N. Y. 133; *Sawyer* v. *The City of Alton*, 3 Scammon, 130; *Town of Pleasant* v. *Kost*, 29 Ill. 494; *Crowley* v. *Copely*, 2 La. An. 229; *Yeatman* v. *Crandall*, 11 La. An. 220; and *Egyptian Levee Co.* v. *Hardin*, 27 Mo. 495. As to the question that the title of the Act was no part of it, they cited, 1 Kent, 579; *Ogden* v. *Strong*, 1 Paine, C. C. 584 : *United States* v. *Fisher*, 1 Cranch. p. 85, and Dwaris' Statutes, Potter's ed., p. 102.

By the Court, CROCKETT, J.:

This is a proceeding by *certiorari* to review the action of the Board of Supervisors of Yolo County, in organizing "Reclamation District No. 108," and in including therein certain lands of the petitioner, held under title derived from the Mexican government, and which are alleged to be upland, not subject to overflow, and for that reason not subject to be included in a swamp land district. It is claimed: First, that the petition to the Board for the formation of

the district omitted to aver several jurisdictional facts, and that, in the absence of such averments, the Board acquired no jurisdiction of the proceedings; second, that if the petition was sufficient and regular on its face, the Board has no authority under the statute to include within the district any but swamp and overflowed land; nor any lands held under title derived from Mexico. The defects alleged to exist in the petition are, that it omits to state—First, "the quantity sold and the quantity remaining unsold" in the proposed district; second, "the number of acres in each tract sold, with the name (if known) of the owner thereof," as required by Section 30 of the Act of March 28th, 1868. (Statutes 1867-8, p. 514.)

On the former hearing we were of the opinion that the petition was substantially defective in both of these particulars. But at the last hearing it appeared from an amended return to the writ, that the petition did, in fact, state, with sufficient particularity, the number of acres in each tract sold, with the name of the owner thereof, if known. But amongst the owners specified in the petition "The Sacramento Valley Reclamation Company" is stated to be the owner of a large portion of the land sought to be reclaimed, and there is no averment that this company is a corporation: or if it be, that it is capable in law of taking and holding lands. The precise question arose in *Myers* v. *Croft*, 13 Wall. 291, whether, under similar circumstances, a company described in the same manner would be presumed to be capable in law of acquiring and holding real estate. In that case a conveyance of land was made to "The Sulphur Springs Land Company," which was not otherwise described in the instrument, and there being nothing in the proofs to show whether the grantee was a corporation and capable of taking lands, or an unincorporated company. On this point the Court said: "It is sufficient to say, in the absence of any proof whatever on the subject, that it will be presumed the land company was capable in law to take a conveyance in real estate." This is a direct adjudication of the point, by the Court of the highest authority, and must be deemed conclusive.

We are therefore of opinion that the petition was not defective in this particular.

The other alleged defect in the petition presents a question of more difficulty. There is in the petition no direct averment of the quantity of land sold and of the quantity remaining unsold, in the proposed district, but the argument for the respondent is, that the schedule annexed to and forming a part of the petition, is averred on the face of the petition, to contain a complete list, by Government subdivisions, of all the lands in the district, with the names of the owners when known, and when the owners were unknown, that fact is stated. It is said, this was equivalent to an averment that all the lands in the district were held in private ownership, and had, therefore, been sold, and that none remained unsold by the State. If the petition was subjected to the test of a special demurrer, we would have no hesitation in holding that it is defective in this particular. But, possibly, it is capable of the interpretation placed upon it by the respondents, and in view of the serious consequences which would probably result from setting aside the proceedings of the Supervisors, we are inclined to give to the petition the most favorable interpretation of which it is fairly susceptible. In *Rutland* v. *County Commissioners of Worcester*, 20 Pick. 79, Chief Justice Shaw, in delivering the opinion of the Court, said that the application for a writ of *certiorari* is addressed to the discretion of the Court "and ought not to be granted, even if the record, when returned on *certiorari*, would appear to be defective or informal, where substantial justice has been done, or where, if the proceedings are quashed, ruinous or very mischievous consequences would ensue, and where, upon such reversal of proceedings, parties cannot be placed in *statu quo*." The same views, substantially, were announced by this Court in *Keys* v. *Supervisors of Marin*, 42 Cal. 252. In the case at bar, the petitioner appeared before the Supervisors, when the proceedings for organizing the district were *in fieri*, and interposed no objection to the insufficiency of the petition, except that it proposed to include in the district his lands, which were held under a Mexican grant. Instead

of taking steps promptly to arrest the proceeding if the petition was insufficient, it does not appear that he made any movement in that direction until more than six months had elapsed, and it may be that large sums were expended in the interim in reclaiming the lands. Under these circumstances, when the petition is assailable on technical grounds, we should construe it liberally and indulge in every reasonable intendment in its support. In the language of Chief Justice Shaw, even though the record should "appear to be defective and informal, when substantial justice has been done," or " very mischievous consequences would ensue," or " where the parties cannot be placed in *statu quo*," the Court, in the exercise of a sound discretion, may deny the writ. Acting on this rule, we must decline to quash these proceedings on the ground that the petition omits to state with sufficient precision what lands within the district had been sold and what remained unsold.

The next objections urged against the validity of these proceedings are, first, that the lands of the petitioner, which are included in the district, are not swamp and overflowed lands; and, second, that they are held under title derived from the Mexican Government; and that, for each of these reasons, they are not subject to be included within a reclamation district. We shall examine these points in their order. The act of March 28th, 1868, under which these proceedings were had, establishes what was intended to be a complete system for the reclamation of swamp and overflowed lands in this State. Whether it was designed to apply to all the swamp land in the State, or only to that portion ceded to this State by the act of Congress of September 28th, 1850, known as the Arkansas Act, will be more appropriately considered in discussing the next point. Section 30 of the act of March 28th, 1868, provides that " whenever the holders of certificates of purchase, patents, or other evidences of title representing one half or more of any body of swamp and overflowed, salt, marsh, or tide lands, susceptible of one mode of reclamation, desire to reclaim the same, they shall present to the Board of Supervisors of the county in which the said lands or the greater

portion thereof are situated, a petition setting forth that
they desire to adopt measures to reclaim the same, the de-
scriptions of the lands they propose to reclaim, by township,
range, section, and subdivision of section; the quantity sold
and the quantity remaining unsold; the number of acres in
the whole district, and the number of acres in each tract,
with the name (if known) of the owner thereof." Provision
is then made for giving notice of the application; and Sec-
tion 31 provides, that "if the Board of Supervisors shall
find, upon the hearing of said petition, that the statements
therein set forth are correct, and that no land is improperly
included or excepted from said district, they shall note their
approval on the petition, which approval shall be signed by
the President of the Board, and attested by the Clerk."
Provision is then made for recording the petition, and for
forwarding a copy of it to the Register of the State Land
Office; also for the establishment of by-laws, and the elec-
tion of a board of trustees for the district. It appears on
the face of the application of the petitioner for this writ,
that on the hearing before the Board of Supervisors of the
petition for the organization of the district this petitioner
appeared and filed a written protest against including his
lands within the proposed district, on the ground that he
claimed and held them under title derived from the Mexi-
can Government; but the protest is silent as to the fact that
the lands are swamp and overflowed or otherwise. It
further appears on the face of the application, "that there-
upon said Board heard and considered said petition and
protest together, it then and there being admitted by the
respective parties that the matter stated in said petition and
protest were true." After considering the petition and pro-
test, the Board entered an order in these words: "The
Board having heretofore taken this matter under advise-
ment, and it appearing to the Board upon the hearing of the
petition heretofore filed that the statements therein set forth
are correct, and that no land is improperly included in or
excepted from said district, the petition is hereby ap-
proved." It appears, then, on the face of the application,
first, that the petition to the Board of Supervisors, described

all the land within the proposed district as swamp and overflowed; second, that this petitioner had notice of and appeared at the hearing; third, that in his written protest, he did not claim that his lands were not swamp and overflowed; fourth, that he admitted at the hearing all the averments of the petition to be true; fifth, that the Board adjudged the petition to be true, and that no lands were improperly included in the district.  On these admitted facts, we think the petitioner should be considered as estopped from denying in this proceeding, that all the lands included in the district are swamp and overflowed.  As we have already seen, the writ of *certiorari* does not issue *ex debito justitiæ*, but only on application to the Court, and for special cause shown.  When it appears in the application that at the hearing before the Board, this petitioner admitted all the lands in the proposed district to be swamp and overflowed, he should not now be permitted for the purposes of this writ, to deny the truth of the admission.

The only remaining question is, whether swamp and overflowed lands held under title derived from the Mexican Government were properly included in the reclamation district.  It is insisted they were not, because first, the Act of March 28, 1868, was not intended to apply to the reclamation of any lands, except those acquired under the Arkansas Act; and second, that if it was intended to include other swamp and overflowed lands, the Act was, *pro tanto*, unconstitutional and void.  It is not claimed that there is any express provision in the Act limiting its operation to a particular class of swamp and overflowed lands.  But it is inferred by counsel, from the title of the Act, and from certain of its provisions, that the scheme of reclamation which it inaugurated, was intended to apply exclusively to lands acquired under the Arkansas Act.  The title is "an Act to provide for the management and sale of the lands belonging to the State."  The statute is very comprehensive in its provisions, and contains minute directions respecting the sale and disposal of all classes of land belonging to the State.

There is nothing in the title having special reference to

the scheme of reclamation, established in the subsequent
sections, and nothing from which it can be inferred that it
was to be limited to a particular class of swamp and over-
flowed lands.   In construing statutes, resort is sometimes
had to the title, as tending to throw some light upon the
intention of the Legislature, in very doubtful cases; but in
any case it is entitled to but little weight, and is never
allowed to enlarge or control the language in the body of
the Act.   The particular provisions which are relied upon
as tending to support the construction contended for are
those which authorize " the holders of certificates of pur-
chase, patents, or other evidences of title," to present the
petition for the formation of the district, and which require
the State Register to send to the County Treasurer a statement
showing the names of the owners who have paid in full for
their lands, and the amounts deducted therefrom for moneys
drawn from the Swamp Land Fund.   Also those which
authorize the Treasurer in the collection of assessments to
allow certain credits to such owners as have paid the State
in full for their land.   There can be no doubt that it was
foreseen by the Legislature that the great body of the lands
to be reclaimed were those acquired under the Arkansas
Act, and a large portion of which has already been sold by
the State to private persons.   One of the conditions of the
Act under which the State acquired these lands was, that
the proceeds of their sale should be applied exclusively to
their reclamation; and in the faithful observance of this ob-
ligation, it was the duty of the State, on a sale of the lands,
to devote the proceeds accordingly.   Hence the Act pro-
vides that where purchasers had paid the State for the
land, the purchase money should be returned, in the shape
of a credit on the assessment for the work of reclamation.
But we fail to discover, in any of these provisions, an inten-
tion to limit the scheme of reclamation to lands of this class.
On the contrary, we think the purpose was to inaugurate a
great system of reclamation, by which all the swamp lands
in the State might ultimately be reclaimed, and rendered
habitable and productive.   The scheme would be compara-
tively useless, and, perhaps, in a great degree impractica-

ble, if restricted as counsel insist it was intended to be. We are fortified in these views by a legislative construction of the Act in question.  By the Act of March 30th, 1872, (Statutes 1871-2, p. 176), it was provided that all the swamp and overflowed lands in Reclamation District No. 108 (the one we are now considering) "shall, and they are hereby declared to be liable for all assessments levied or to be levied thereon, for the work of reclamation in said district." The reasonable inference is, that when this Act passed, the Legislature was aware that the district included a large body of land held under a Mexican title.  By another Act passed at the same session, providing for funding the indebtedness of the reclamation and levee districts of this State, it is provided in Section 14 "that nothing in this Act contained shall be construed to exclude from its operation land derived from the Mexican Government, if actually swamp and overflowed land." (Statutes 1871-2, p. 839.) In every aspect in which we can regard the statute, we are forced to conclude that it was not intended to be limited to lands acquired under the Arkansas Act.

It is said, however, that it is not within the constitutional power of the Legislature to compel the petitioner to reclaim his lands at his own expense, and against his consent.  But we think the power of the Legislature to compel local improvements, which, in its judgment, will promote the health of the people, and advance the public good, is unquestionable.  In the exercise of this power it may abate nuisances, construct and repair highways, open canals for irrigating arid districts, and perform many other similar acts for the public good, and all at the expense of those who are to be chiefly and more immediately benefited by the improvement. The Constitution of the State is not a grant, but a limitation of power; and when an Act of the Legislature is called in question as repugnant to the Constitution, those who assail it on this ground must specify the particular provision of that instrument which is violated.  The clauses of the Constitution which, or some of which, are alleged to have been violated by the act under consideration, are: 1st. That which secures to the-citizen the right "to acquire,

possess and protect property." 2d. That which secures to him the right of trial by jury. 3d. That which provides that "no person shall be deprived of life, liberty or property without due process of law." 4th. That which prohibits "the taking of private property for public use without just compensation." 5th. The provision that taxation shall be equal and uniform, and that property shall be taxed on the *ad valorem* principle. In my opinion the act in question violates none of these provisions, and the authority to compel local improvements at the expense of those to be immediately benefited, is not taxation, though referable to the taxing power. It has never been held that taxation for general purposes, or for local improvements, is an infringement of that clause of the Constitution relating to the acquisition and enjoyment of property; and the right of trial by jury, has no application to proceedings for the collection of taxes. Nor does the inforcement of a valid tax, by whatever method, constitute a taking of property without due process of law, in the sense of the Constitution; nor is it a taking of private property for public use, within the purview of that instrument. (*People* v. *Mayor of Brooklyn*, 4 Comst. 419; *Emery* v. *S. F. Gas Co.*, 28 Cal. 345; *Sears* v. *Cottrell*, 5 Mich. 251; *Murray's Lessee* v. *Hoboken Land and Imp. Co.*, 18 How. U. S. 272.) It is equally clear that those clauses which provide that taxation shall be equal and uniform throughout the State, and which prescribe the mode of assessment and the persons by whom it shall be made, and that all property shall be taxed, have no application to assessments levied for local improvements. (*Burnett* v. *Mayor of Sacramento*, 12 Cal. 76; *Emery* v. *S. F. Gas Co.*, *supra*, and cases there cited; *Egyptian Levee Co.* v. *Hardin*, 27 Mo. 495; *Yeatman* v. *Crandall*, 11 La. An. 220; *Wallace* v. *Shelton*, 14 La. An. 498.)

But we need not rest our decision on the narrow ground that this is strictly a local improvement. On the contrary, the reclamation of the vast bodies of swamp and overflowed land in this State may justly be regarded as a public improvement of great magnitude, and of the utmost importance to the community. If left wholly to individual enter-

prise, it would probably never be accomplished; and in inaugurating so great a work, the Legislature has pursued, substantially, the same system adopted in other States for the reclamation of similar lands—to wit : by dividing the territory to be reclaimed into districts, and assessing the cost of the improvement on the lands to be benefited. This plan has been adopted in the States of Louisiana, Mississippi, and Arkansas, to prevent the annual overflow of the Mississippi, by means of levees or embankments, constructed at the expense of the adjacent property. The "Black Swamp," in Ohio, has been wholly or partially reclaimed by the same method. A large body of land in Missouri is protected from inundation by similar means. In Massachusetts and Connecticut, swamps and low lands are drained by means of assessments on the property benefited; and in New Jersey the salt marshes have been reclaimed in the same way. In this State, the city of Sacramento, including the ground on which the Capitol stands, has been protected from inundation by means of levees, erected at the expense of the inhabitants, in the shape of a tax on the property within the district benefited. In none of these States, so far as we are aware, has the power of the Legislature to cause such improvements to be made in this method ever been denied; nor do we see any tenable ground on which it can be questioned. We are, therefore, of opinion that the act of 1868 is not unconstitutional, and that the Board of Supervisors did not exceed its jurisdiction.

Writ dismissed.

Mr. Justice Rhodes, concurring specially : I concur in the judgment.

Mr. Justice Niles did not express an opinion.