[Civ. No. 672.   Fifth Dist.   Jan. 3, 1967.]

W. O. THOMPSON et al., Plaintiffs and Respondents, v. BOARD OF DIRECTORS OF THE TURLOCK IRRIGATION DISTRICT, Defendant and Appellant.

Jeremy C. Cook for Defendant and Appellant.

Sherwood Green and Denslow Green as Amici Curiae on behalf of Defendant and Appellant.

Richard T. Tosaw for Plaintiffs and Respondents.

GARGANO, J.—Appellant Board of Directors of the Turlock Irrigation District appeals from a judgment of the superior court issuing a writ of mandate directing the appellant to change the boundaries of the divisions of the district. The undisputed facts are substantially as follows.

The Turlock Irrigation District, a special district embracing 195,802 acres of land located within three counties,[1] was formed in 1887 under the "Wright Act." This act was superseded 10 years later by the "Wright-Bridgeford Act," which is now codified in the state Water Code as division 11 commencing with section 20500 and is known as the Irrigation District Law. The district is governed by a governing board (appellant herein) consisting of five members, and is divided into five divisions with one director elected from each division. These divisions have not been modified for over 30 years; their land areas and estimated populations are as follows:

---

[1] Merced, Stanislaus and Tuolumne Counties.

| Divisions | No. of Acres | Percentage of Total Acreage | Estimated Population | Percentage of Population |
|---|---|---|---|---|
| Division One | 42,319 | 21.6% | 4,925 | 7% |
| Division Two | 33,015 | 16.9% | 23,621 | 33% |
| Division Three | 40,016 | 20.4% | 8,949 | 13% |
| Division Four | 38,111 | 19.5% | 24,996 | 35% |
| Division Five | 42,341 | 21.6% | 8,554 | 12% |

The respondents (who are landowners, assessment payers, residents and electors of the district) petitioned the appellant board of directors to redraw the division lines so that there would be less disparity in the population among the five divisions. The appellant declined to make the change and as a consequence respondents petitioned the Superior Court of Stanislaus County to compel appellant to do so. At the hearing on the petition the only evidence taken was the testimony of the assessor of the district; he testified that not more than 10 percent of the assessment revenue of the district came from property within the two incorporated cities located in the district.[2] The cause, by stipulation of the parties, was then submitted "on the pleadings," the appellant apparently admitting the facts as stated herein. The trial judge granted judgment issuing a writ of mandate, directing the appellant "to redraw the boundary lines of the divisions within said district so that there will no longer be the wide deviation in population which presently exists between the various divisions." This appeal followed.

I

The first question raised in this appeal is both basic and fundamental, and profoundly affects the many forms of local government within this and other states. This question is whether the "one man, one vote" doctrine originating from the federal apportionment cases applies to a special district such as an irrigation district formed under the Irrigation District Law. If it does, the appellant board of directors has no choice but to change the boundaries of the district divisions in order to equalize the population, and in doing so may not consider land area as a factor.

The "one man, one vote" doctrine grew out of the now historic and often cited case of *Baker* v. *Carr*, 369 U.S. 186 [7 L.Ed.2d 663, 82 S.Ct. 691], where the court reopened the question of the extent to which federal courts will review the

[2]Ceres and Turlock.

general fairness of state schemes of legislative apportionment. In that case, the court brushed aside previous assumptions by lower federal courts that either the subject matter of state legislative apportionment was not within the jurisdiction of the courts or, that although within the jurisdiction of the courts, was nevertheless a political matter and nonjusticiable, and concluded that the right to vote equally for state Legislatures was protected by the equal protection clause and the due process clause of the Constitution. Accordingly, the court held that the state Legislature must be so constituted as to give equal rights to all people of the state.[3] Two years later in the case of *Reynolds* v. *Sims,* 377 U.S. 533 [12 L.Ed.2d 506, 84 S.Ct. 1362], in deciding that the due process and equal protection clauses required that the state Senates be apportioned solely on the basis of population, the United States Supreme Court used this strong language:

" 'No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. . . .' " (377 U.S. 560 [12 L.Ed.2d 526, 84 S.Ct. 1380].) And, the court added, the right to vote ". . . 'touches a sensitive and important area of human rights,' and 'involves one of the basic civil rights of man,' presenting questions of alleged 'invidious discriminations . . . against groups or types of individuals in violation of the constitutional guaranty of just and equal laws.' . . ." (377 U.S. 561 [12 L.Ed.2d 527, 84 S.Ct. 1381].)

It goes without saying that the "one man, one vote" doctrine grew out of abuses in voting procedures in state Legislatures. Moreover, it is reasonably apparent that the underlying reasons behind these decisions apply not only to the state itself but to those municipalities, state agencies or political subdivisions that exercise general government functions and are designed to be controlled by the voters of the geographic area over which they have jurisdiction, such as cities and counties. (*Miller* v. *Board of Supervisors,* 63 Cal.2d 343 [46 Cal.Rptr. 617, 405 P.2d 857] ; *Wiltsie* v. *Board of Supervisors,* 65 Cal.2d 314 [54 Cal.Rptr. 320, 419 P.2d 440].) The question, however, as to whether the doctrine applies to a limited purpose district, public authority or similar entity, is more

---

[3]For a complete discussion of the cases and problems dealing with reapportionment, see 13 U.C.L.A. L.Rev. 135.

difficult to answer and requires a careful analysis of the nature and characteristics of these entities.[4]

To the one extreme it is arguable that special districts and similar entities are creatures of the Legislature, deriving their powers therefrom, and that in the exercise of these powers, whether legislative, administrative, ministerial or quasi-judicial, they are subject to the same constitutional standard in prescribing the voting procedures for the selection of the members of their governing bodies as the Legislature itself. To the other extreme it is arguable that the doctrine is applicable only to legislative bodies exercising pure legislative powers and that although cities and counties meet this test, since they are important organs of local government exercising general powers of government with the right to exert coercive force upon the people within their territorial jurisdiction, special districts do not, and are not subject to the rule. ■ We believe, however, that a middle course is preferable and that whether a special district is subject to the doctrine depends upon such factors as its purpose, the number and exact nature of its functions, and the manner in which they are exercised. Stated otherwise, if the principal purpose of a district is to provide a service or services which can be and are sometimes provided by a private or quasi-public corporation (such as a public utility company), and if in the accomplishment of this purpose it does not exercise general powers of government, it is not subject to the "one man, one vote" rule. If, however, its principal purpose is to govern or if its functions are primarily governmental in nature, or if not governmental in nature they are accomplished by the exercise of general powers of government, it meets the test, and the doctrine is applicable. Thus, we believe that each type of district must be considered by itself and upon the basis of its own facts and circumstances.

■ With this in mind, we have examined the Irrigation District Law and we conclude that an irrigation district formed under this law is clearly distinguishable from a city or county, possessing none of the essential characteristics which would require the application of the "one man, one vote" doctrine.[5] ■ The principal purpose for which the district

---

[4]For a thorough discussion of the effect of federal cases on local entities, see 65 Colum. L.Rev. 21.

[5]The distinction between a county or municipality and such a district was ably and succinctly explained in *People* ex rel. *City of Downey* v. *Downey County Water Dist.*, 202 Cal.App.2d 786 [21 Cal.Rptr. 370] at page 795, where the court, in referring to a county water district, said:
" . . . the district's primary purpose is to carry out all of the neces-

is formed is to develop and distribute sufficient water to lands within its boundaries for beneficial use.[6] The district, therefore, is formed to provide a service which can be and often is provided by a quasi-public corporation. Furthermore, in accomplishing its purpose it does not exercise general powers of government; in fact, with a few possible exceptions, its powers are essentially administrative and ministerial in character. It possesses the right to make assessments but even this right is limited to assessments against land exclusive of improvements or personal property.[7] It possesses the right of eminent domain but this right is also conferred on railroads and public utility companies. It possesses the right to impose charges for its services but this right is inherent in private and quasi-public corporations.

From the foregoing, we conclude that the Legislature was not required to set up a voting procedure for the election of the members of its board of directors. However, there is a secondary question. Having set up a voting procedure, did the Legislature thereby become bound by the ''one man, one vote'' rule so as to make Water Code section 21605 with its dual criteria of population and area unconstitutional? We think not, for we believe that this classification by the Legislature is reasonable.[8] █ As we have seen, an irrigation district is

sary functions and operations of supplying sufficient water to inhabitants within its boundaries, and the Water Code gives it the power to do so (§ 31020). In succeeding sections numerous other powers are conferred upon it to effectuate its special purpose; but nowhere therein or in any other legislative enactment, has a district been given powers in matters of police protection, traffic, zoning, health, recreation, regulation of business, transportation, the police power or other functions essential to municipal government.''

[6]The district may engage in other functions such as drainage, flood control, generation of power and electricity, and sewage disposal, but most of these powers are related or ancillary to its principal purposes, i.e., the development and distribution of water for beneficial use.

[7]The distinction between such a district's power to assess and the power of taxation was recognized in *Turlock Irr. Dist.* v. *Williams*, 76 Cal. 360, 370 [18 P. 379], which relied, in part, on *Hagar* v. *Supervisors of Yolo County*, 47 Cal. 222, 234; in *Hagar* the court stated: ''It is equally clear that those clauses which provide that taxation shall be equal and uniform throughout the State, and which prescribe the mode of assessment and the persons by whom it shall be made, and that all property shall be taxed, have no application to assessments levied for local improvements.''

[8]Even as to rights protected by the due process and equal protection clauses, reasonable classifications and distinctions may be made. For example, while the right to vote for all citizens is recognized, state laws preventing minors from voting are upheld as reasonable classification. Moreover, labor and similar laws distinguishing between adult males and females and between adults and minors have been upheld time and time again as reasonable classifications.

formed and it operates for the improvement of land. It has no relation to, nor effect upon, the general population within its boundaries. Proceedings to form such a district are not initiated by residents but by petition of landowners owning 50 percent of the assessed value of the lands within the proposed boundaries. At the formation hearing before the board of supervisors of the principal county, lands which will not be benefited must be excluded. The members of the board of directors may be elected at large or from divisions, depending upon the wishes of the landowners as expressed in the formation petition. Assessments for revenue purposes are limited to the land and may not include improvements or personal property. Thus, there is ample justification for the Legislature to include land area as a factor to be considered in fixing the division boundaries.

In support of the contrary view, respondents during oral argument pointed to the fact that the Turlock Irrigation District could establish water and power rates for people within the boundaries of the cities of Turlock and Ceres, and that for such reason the population in these cities should have a direct voice, on a "one man, one vote" basis in the selection of the district board. This argument, however, is without merit when considered in the light of *San Ysidro Irr. Dist.* v. *Superior Court,* 56 Cal.2d 708 [16 Cal.Rptr. 609, 365 P.2d 753]. There the court held that if a district supplies water to inhabitants of a city within its boundaries it must do so under a franchise given by the city and which the city has the right to withhold. Even here the inhabitants of a city are insulated from direct acts of the board of directors of an irrigation district by their own city government in which they have the right of election.

## II

The second question raised in this appeal is whether section 21605 of the Water Code imposes a duty upon the board of directors to change the boundaries of the district divisions from time to time in order to keep the divisions as nearly equal in area and in population as may be practicable. Section 21605 provides: "When it deems it advisable for the best interests of the district and the convenience of its voters, the board may . . . change the boundaries of the divisions . . . ." This language clearly indicates that whether such changes shall be made rests in the sound discretion of the district board of directors. In fact, the proviso is similar to the language used in former Political Code section 4029 (now

Government Code § 25001) concerning county supervisorial districts, which was construed as permissive rather than mandatory in *Dozier* v. *Board of Supervisors*, 130 Cal.App. 746 [20 P.2d 726], and *Peterson* v. *Board of Supervisors*, 93 Cal. App. 490 [269 P. 743].[9] Moreover, under the Water Code section the board must use two criteria (land area and population), and it is therefore apparent that its discretion is a broad one.

Appellant relies on the case of *McKim* v. *Imperial Irr. Dist.*, 201 Cal. 110 [255 P. 506], in support of its position that Water Code section 21605 does not require it to change the boundaries of the divisions, and that it cannot be compelled to do so. Respondents, on the other hand, argue that this case supports their position that the board's discretion is not unlimited, and that under proper circumstances it may be compelled to change the district boundaries in order to keep the divisions as nearly equal in area and population as may be practicable.

We do not believe that *McKim* helps either side on this particular point. In that case, the board of directors had changed the boundaries of the divisions and the question before the court was whether it had conformed with the mandatory language prescribing the primary standard to be applied in making the changes. In other words, the court was not concerned with the question as to whether an irrigation district board may be compelled to change division boundaries, but, rather, whether it had acted within the limits of its powers in doing so. This is an entirely different question from that presented in this appeal, for it is fundamental that even where a public board cannot be compelled to act, when it does act it must do so within the limits of its powers.

The leading California Supreme Court decision on the subject of a public board's discretion in relation to its permissive right to change the boundaries of the districts or divisions from which its members are elected is the case of *Griffin* v. *Board of Supervisors*, 60 Cal.2d 318 [33 Cal.Rptr. 101, 384 P.2d 421]. There, the Supreme Court rejected the concept of earlier appellate cases that the word "may," as used in Government Code section 25001, granted unlimited discretion to the board of supervisors for making boundary changes in supervisorial districts. That is, the court recognized that the

---

[9] These cases were overruled by *Griffin* v. *Board of Supervisors*, 60 Cal.2d 318 [33 Cal.Rptr. 101, 384 P.2d 421], in relation to their holding that a board of supervisors' discretion is unlimited.

word "may" conferred a limited discretion; but the court also made it clear that the board could be compelled to change the boundaries where its failure to do so constituted an abuse of its discretion. The court at page 322 of the opinion stated: "We cannot agree with the contention that section 25001, by providing that the board 'may' change district boundaries, leaves the matter of redistricting entirely to the board's discretion and that therefore the board cannot be required to redistrict however unreasonable its refusal to do so may be. The section, in setting forth the primary standard to be applied, uses the mandatory language that the districts 'shall be' as nearly equal in population as may be. . . . Although section 25001 gives a board of supervisors some discretion in deciding whether redistricting has become necessary to conform to the standard there set forth, this discretion is not unlimited, and where there are drastic deviations from equality of population the refusal to redistrict is an abuse of discretion."

It is true that the facts in *Griffin* are distinguishable from the facts of the instant case. In *Griffin* the court was discussing the discretion of the board of supervisors of a county, and was obviously influenced by the philosophy enunciated in the federal apportionment cases. In fact, that this was the court's main concern is clearly evident by its mention of *Blotter* v. *Farrell*, 42 Cal.2d 804 [270 P.2d 481], about which the court said: ". . . it was recognized that our system of government requires whenever possible equality of population among election areas and that drastic population differences may destroy the representative character of government." (*Griffin, supra,* at p. 321.) We nevertheless believe, however, that a part of the rationale of *Griffin* applies to this case. In *Griffin* the court interpreted the provision of the Government Code which prescribes the standard to be used in redistricting (and which contains mandatory language that "the districts shall be as nearly equal in population as may be") as imposing a duty on the board which the board may not unreasonably or arbitrarily ignore. ■ Water Code section 21605, in setting forth the primary standard to be applied by the board of directors of an irrigation district in fixing division lines, also uses this type of mandatory language: ". . . The changes shall be made to keep the divisions as nearly equal in area and population as may be practicable." This language imposes a duty on the district board which it cannot arbitrarily or unreasonably ignore. ■ Thus, we conclude that redivision

may be compelled (1) where drastic changes in population have occurred which create wide deviations from the statutory standard and (2) where said deviations could be eliminated without unduly sacrificing land areas and without producing impractical results, and (3) where the board abuses its discretion by failing to take remedial steps on its own initiative.

### III

The final question is whether the respondents' evidence is sufficient to establish an abuse of discretion in this case. We believe it is.

It is evident that while the land areas in the district divisions are substantially equal, the disparity in population among the five divisions is extreme. In fact, as between some divisions, there are drastic deviations. For example, the disparity between Division No. 1 and Divisions No. 2 and 4 is almost five to one, and the disparity between Divisions No. 3 and 5 and Divisions No. 2 and 4 is almost three to one. Moreover, appellant has admitted that no boundary changes were made (and apparently none were attempted) in any of the divisions in over 30 years, and this despite the vast increases in population which occurred throughout the entire state during this same period.[10] And, significantly, the appellant's attitude before the superior court was not that it had properly exercised its discretion in failing to change the division boundaries because it was impracticable to do so, but rather that it could not be compelled to do so by the court.[11]

It is true, as we have stated, that the court in *McKim* v. *Imperial Irr. Dist., supra*, 201 Cal. 110, indicated that the discretion of the board of directors of an irrigation district in changing the division boundaries is a broad one. As a matter of fact, the court at page 114 of the opinion, in referring to the two elements to be considered, had this to say: "... Both these elements must be taken into consideration and equalized as nearly as practicable, and if equality in one element must be sacrificed somewhat for equality in the other the question of which element shall be considered as the more important must rest in the broad discretion given to the directors. The directors are not compelled to defend their division as the most nearly perfect one possible, and this is

---

[10] A fact of which we take judicial notice.

[11] During argument before the superior court in referring to the board's power to change the boundaries of divisions, appellant's counsel stated: "... It is our position that this is a discretionary power which cannot be controlled by the Courts. ..." (R.T. p. 44.)

conceded by respondents.'' It is noteworthy in *McKim*, however, that the board had acted by changing the division boundaries and therefore had exercised its discretion. Moreover, there, before the changes in divisions were made, the greatest disparity was between the land areas, one division containing five times as much land as one of the other divisions.[12] The changes made by the board of directors had apparently substantially corrected the previous existing land area disparities without, as the court observed, making the population between divisions ''more unequal.'' Accordingly, the court held that under these circumstances the board had not abused its ''broad'' discretion.[13]

Respondents' evidence, therefore, establishes a prima facie case of abuse of discretion on the part of the appellant board of directors. In view of the board's attitude that it could not be compelled to change the division boundaries irrespective, apparently, of drastic deviations in population in the divisions, the trial court was justified in granting judgment ordering it to do so. The judgment, however, is much too broad and fails to include the second element (land area) within its direction, thereby foreclosing the appellant from taking into consideration geographic problems, location of cities and similar factors, which could well justify reasonable deviations in population among the five divisions. Moreover, the judgment assumes that a more equitable equalization of the population is absolutely possible, and it does not afford the board of directors the opportunity to justify its position by showing, after conscientious and exhaustive study, that such changes are highly impracticable because of geographic conditions or similar factors.

---

[12]The population of the divisions, either before or after the changes, is not given in the opinion, but it would appear that the gratest disparity in this connection was approximately two to one.

[13]Appellant's counsel asserts in his brief that even after the changes were made in *McKim* there was a disparity of five to one between the population of the divisions. We do not believe that this is necessarily so, for we believe that the court in using the five to one ratio was referring to the voter registration proportion to population which was used by the parties in arriving at the estimated population of the divisions. In other words, the ratio of five to one, and sometimes three to one, is often used in estimating population after counting the registered voters in a given area. In fact, the court, on page 114 of the opinion, stated:

''. . . Upon the question of population, the evidence was not direct and satisfactory. The only information on the subject in the record is a stipulation of counsel that the population was approximately five to one with reference to the registration in the divisions. But taking this estimate as accurate, it does not appear, upon the whole, that the population was made more unequal. Between certain divisions it was more equalized and between others it was made slightly more unequal.''

Accordingly, the second paragraph of page 2 of the judgment, commencing with line 5, is modified as follows (modification italicized):

"IT IS HEREBY ORDERED, ADJUDGED AND DECREED that a Peremptory Writ of Mandate be issued by the Clerk of this Court under its seal directing the defendant-respondent Board of Directors of the Turlock Irrigation District to redraw the boundary lines of the divisions within said district so that there will no longer be the wide deviation in population which presently exists between the various divisions, *and so as to make the said divisions as nearly equal in area and in population as may be practicable. Should the district board fail to discharge its duty to redraw the boundary lines of the divisions as indicated herein within a reasonable time from the entry of this judgment, this court shall hold further hearings and enter further orders as may be appropriate upon its own motion or the motion of either party, and this court shall retain jurisdiction for such purposes and for making a final disposition of this case.*"

As so modified, the judgment is affirmed.

Conley, P. J., and Stone, J., concurred.