[Civ. No. 44715. Second Dist., Div. Three. Sept. 25, 1975.]

SIMI VALLEY RECREATION AND PARK DISTRICT et al.,
Plaintiffs and Appellants, v.
LOCAL AGENCY FORMATION COMMISSION OF VENTURA
COUNTY et al., Defendants and Respondents.

**COUNSEL**

Files, McMurchie, Foley & Brandenburger, Donald W. McMurchie and Gordon R. Lindeen, for Plaintiffs and Appellants.

Dorothy L. Schechter, County Counsel, and James L. McBride, Chief Assistant County Counsel, for Defendants and Respondents.

## OPINION

**POTTER, J.**—This is an appeal from a judgment of dismissal after demurrers were sustained (without leave to amend) to all 14 causes of action of a petition for writ of mandate. Petitioners Simi Valley Recreation and Park District (hereinafter "District"), and Marietta R. Spotts and John K. Hubbell, residents and property owners within the district, sought by their petition to nullify the determinations of respondents Local Agency Formation Commission of Ventura County (hereinafter "LAFCO") and Board of Supervisors of Ventura County (hereinafter "Board") approving and carrying out the detachment of some 10,000 acres of undeveloped land from the territory encompassed within the District.

Each of the 14 causes of action included in the petition as amended asserted a different theory for the claimed invalidity of the action taken. The demurrer was made "generally to the Petition on file herein and to each separate cause of action therein on the grounds that neither the Petition nor any of the individual causes of action therein allege facts sufficient to state a cause of action against respondents." The seventh cause of action was demurred to on the ground that it was on its face barred by the statute of limitations embodied in section 21167 of the Public Resources Code. In addition to filing the demurrer respondents answered the petition, denying the allegations upon which the claims of invalidity were based.

An order to show cause setting the matter for hearing on June 14, 1974, was issued; the demurrers were set for hearing the same date, but such combined hearing was postponed until June 28, 1974. At that time, pursuant to an agreement between counsel, the legal issues posed by the demurrers were submitted first, with the understanding that "[i]f the court rulings on the Demurrer are such that factual issues become material, then the matter will be set for hearing at a later time for the submission of factual evidence."[1] It appears, however, that the allega-

---

[1] This version of the stipulation was set forth in a letter from counsel for petitioners attached as exhibit A to the memorandum of points and authorities in support of a notice of motion for permission to file transcripts of the various proceedings. conducted by respondents and by petitioner District. It is not questioned by respondents and it is apparent that the court proceeded upon the basis that it was "limited to a determination of the sufficiency of the complaint as a matter of law" and was obliged to "treat the demurrer as admitting all allegations of material facts" (as stated in the memorandum of ruling).

tions of the petition were treated by both parties as including matters not directly alleged therein but brought to the court's attention in appendices to the memoranda of points and authorities filed in support of and in opposition to the demurrers. The briefs of the parties on appeal likewise treat these matters[2] as though they are incorporated in the petition. Though no formal order was made deeming these materials to be incorporated in the petition, no meaningful consideration of the issues argued by the parties can occur without reference to them, in view of the highly conclusional nature of many of the allegations of the petition.[3] Little purpose would be served by affirming the order sustaining the demurrers on the basis of the inadequacy of these conclusional allegations of the petition. If such were the basis for sustaining the demurrers, leave to amend would clearly have been required. Accordingly, we will deem the petition augmented by facts stated in, but not contentions and conclusions advanced in, the appendices referred to in footnote 2.

In its memorandum of ruling the court noted "the respective positions of the parties having to do with the extent and scope of the review." Those positions bore upon the demurrer to the eleventh cause of action, challenging the determinations of respondent LAFCO and respondent Board for abuse of discretion in that they "are not supported by the weight of the evidence." The court referred to petitioners' position as urging "the independent judgment test" made applicable in *Strumsky* v. *San Diego County Employees Retirement Assn.*, 11 Cal.3d 28 [112 Cal.Rptr. 805, 520 P.2d 29], and respondents' position as advancing the "substantial evidence rule." The court did not, however, resolve this issue, saying in this connection: "The transcript of the hearings involved herein has not been attached to the petition or incorporated therein. Manifestly, on demurrer, I am not, therefore, concerned with matters of evidence nor whether the decisions of LAFCO or actions taken by the BOARD are supported by the weight of evidence. (See *Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 328 [253 P.2d 659].) The

---

[2] Included in this category are exhibits A through D attached to the petition, appendices A and B to petitioners' memorandum, and appendices A through E to respondents' memorandum.

[3] For example, the sixth and eighth causes of action based upon the California Environmental Quality Act (Pub. Resources Code, §§ 21050-21174) state no facts supporting the conclusion that an environmental impact report was "required." It is only by reference to exhibit D to the petition, which is incorporated by reference solely to set forth "[s]pecific procedural errors made in the preparation and approval of a Negative Declaration" by respondent Board, that the factual matters relied upon by petitioners can be found.

resolution of the question whether the independent judgment test or substantial evidence rule would here apply is not required at this stage of the proceedings."

The trial court apparently sustained the demurrer to the eleventh cause of action on the basis of the statement in *Faulkner v. Cal. Toll Bridge Authority,* 40 Cal.2d 317, 330-331 [253 P.2d 659], "that to plead a cause of action . . . the plaintiff must either attach to the complaint a complete transcript of all the evidence upon which the authority acted . . . or, at the minimum, must allege the substance of all of the evidence which the authority did receive . . . ."

Petitioners attempted to deal with this ruling by making a motion to permit filing transcripts of the proceedings. In that motion it was urged that the stipulation avoided the effect of *Faulkner* and called for resolution of the legal issue as to the scope of review on the basis of the conclusional allegations in the petition. The memorandum in support of the motion stated: "If the court had ruled on Demurrer that the Strumsky test was not applicable, then the transcripts would not be relevant." Petitioners further discussed what they might plead if given leave to amend. They said in this connection: "It also seems clear that Petitioners should be permitted to amend their pleadings to incorporate the transcripts and thereby properly raise the Strumsky issue. The sustaining of a Demurrer without leave to amend under these circumstances is improper." Petitioners did not at any time in the trial court claim or allege, or seek leave to amend so as to allege, that the determinations of respondent LAFCO and of respondent Board were not supported by substantial evidence. The motion was denied, leaving in effect the order sustaining all the demurrers without leave to amend, upon which judgment was entered.

Final action completing the detachment has been stayed by successive orders of the trial court, and of this court, pending disposition of this appeal.

*Facts*

The facts pleaded are for the most part undisputed. Petitioner District is a recreation and park district existing under the terms and provisions of chapter 4, Division 5 of the Public Resources Code. (Pub. Resources Code, § 5780 et seq.) It has authority to organize, promote, conduct and

advertise programs of community recreation, to establish systems of recreation and recreation centers including parks and parkways, and to acquire, construct, improve, maintain and operate recreation centers within or without its territorial limits. The area encompassed by District is located in southeastern Ventura County. It includes the City of Simi Valley, the balance of the Simi Valley, and surrounding territory. The 10,000-acre parcel involved in the proposed detachment is a portion (comprising a small fraction of its total area) of the District lying westerly of Simi Valley, and geographically separated from it by a mountain ridge. For the most part, the detachment is mountainous. All of it is undeveloped, there being only one dwelling unit with five persons living there. A large section of it, some 4,200 acres, is now included in a state park, and the remainder is in open space or agriculture. No park or other facilities of petitioner District are located in the detachment.

The detachment was initiated by joint action of respondent Board and of Moreland Investment Company, a large owner of property in the area involved. The Board, by resolution of application of April 6, 1973, requested LAFCO approval of the proposed detachment. Moreland Investment Company previously requested such action by letter of March 21, 1973. The Moreland Investment Company letter cited the action of LAFCO taken on March 14, 1973, "to create a new sphere of influence line between Simi Valley and Moorpark" as the basis for its request. It was followed by a formal application for detachment on April 4, 1973, attaching a LAFCO detachment questionnaire. In response to the question, "What is the present use of the land?" the Company stated, "Cattle grazing—with proposal residential development."

The detachment proposal was an aspect and outgrowth of an extensive planning effort undertaken by respondent Board, the Ventura County Planning Department, and the Ventura County Executive Office relating to the future development of the community of Moorpark. Moorpark is an unincorporated area of Ventura County lying to the west of Simi Valley. This effort, which started in 1971 and which involved broad participation by local citizens groups recognized that urbanization of the Moorpark area was imminent, that uncontrolled growth could result in sprawling urbanization, and sought to develop a future plan in advance of the expected population influx. These efforts culminated in the production of "The Moorpark Community Plan" which, with an addendum of April 1972, was adopted by respondent Board as the Moorpark General Plan. This comprehensive plan included a land use

map indicating the areas in which commercial, industrial and various densities of residential use would be permitted. It also included a "Green Belt Park and Recreation System" which provided for several community parks interconnected by "pedestrian greenbelts, bikeways, and riding trails." As planned, the recreation element would include neighborhood and community parks in the combined ratio of 5 acres for each 1,000 of population. The report noted the absence of an "appropriate vehicle for accepting, improving or maintaining park and recreation land," and referred to the pendency of county action to adopt a Quimby Act (Gov. Code, § 66477 et seq.) ordinance to implement acquisition of the required park and recreation land for transfer to a future Moorpark Park and Recreation District, to a future incorporated City of Moorpark, or for development by the county as the general purpose governmental entity.

Respondent LAFCO held a series of hearings upon the application of respondent Board and Moreland Investment Company, and on August 8, 1973, approved the detachment by resolution of that date. This resolution recited that the commission had "considered all oral and written testimony for and against the said proposed detachment including, inter alia, consideration of the Moorpark General Plan prepared by the Ventura County Planning Department, the study of Special Districts in Ventura County prepared by the Ventura County Executive's Office, the Moorpark and City of Simi Valley Sphere of Influence Plans and discussions of the County open space ordinance." The LAFCO resolution further determined (1) that the detachment was "uninhabited," (2) as authorized by Government Code section 56252[4] that any election called upon the question of confirming such detachment be conducted "only within the territory ordered to be detached" and (3) that the detached area "shall not be subject to any future bond obligations by the Simi Valley Recreation and Park District." The resolution made no reference to existing obligations. (See Gov. Code, § 56470.) Consequently, as provided by section 56492 of the Government Code, the detached property would remain liable for outstanding obligations of the District.

[4]Section 56252 provides as follows: "In any order approving a proposal for an annexation or detachment, the commission may determine that any election called upon the question of confirming an order for any such annexation or detachment shall be called, held and conducted upon such question either:

"(a) Only within the territory ordered to be annexed or detached; or

"(b) Both within the territory ordered to be annexed or detached and within all or such part of said district as is outside of such territory."

Pursuant to section 56291 of the Government Code,[5] respondent LAFCO directed petitioner District to initiate proceedings to effect the detachment. The District gave notice and held hearings as required by Government Code sections 56311-56314. No protests were received by the District from any owners of land in the detachment. There was, therefore, no "majority protest" requiring abandonment of the detachment pursuant to section 56316 of the Government Code. But the District, through its Board of Directors, found that the detachment was "not to the best interests of the District or to the residents of the District residing outside of the territory proposed to be detached" and by resolution of January 9, 1974, refused to consent to the proposed detachment. The District further found that "[n]o detachment should occur unless it is approved by a majority vote of those residing in this District outside of the territory proposed to be detached." In view of the resolution of respondent LAFCO limiting any election to one "only within the territory ordered to be detached," the Board of the District did not order an election.

On February 27, 1974, LAFCO adopted a resolution determining that the District had "failed and refused to conduct or complete proceedings for the detachment" and certified such refusal, pursuant to section 56293[6] of the Government Code, "to the Board of Supervisors of the County of Ventura for purposes of allowing that body to initiate, conduct and complete detachment proceedings consistent with this Commission's resolution . . . ."

Jurisdiction to initiate, conduct and complete the proceedings was assumed by respondent Board on March 5, 1974, pursuant to the

[5]Section 56291 provides as follows: "A district whose boundaries would be changed as a result of a proposed annexation, detachment or minor boundary change shall be the conducting district and proceedings for any such annexation, detachment or minor boundary change shall be taken by the board of directors of such district. The board of supervisors of the principal county shall take proceedings for all other changes of organization and any reorganization, including a reorganization providing, among other things, for any annexation, detachment or minor boundary changes."

[6]Section 56293 of the Government Code provides in pertinent part:

"After the expiration of 35 days from the date of adoption of the commission's resolution making determinations, the commission may by resolution certify to the board of supervisors of the principal county:

". . . . . . . . . . . . . . . . .

"(b) That the board of directors of a conducting district has failed or refused to initiate, conduct or complete proceedings for the change of organization in compliance with the commission's resolution making determinations or has failed to comply with any terms or conditions thereof."

provisions of section 56294[7] of the Government Code. Respondent Board noticed hearings to receive written and oral testimony on the proposed detachment. At a public hearing on April 2, 1974, the hearing was continued in order to permit processing of environmental documents. The Planning Department of the County of Ventura was assigned the job of preparation of environmental documents, though respondent Board took the position that its action was purely "ministerial" and therefore not within the California Environmental Quality Act (Pub. Resources Code, § 21050 et seq., hereinafter "CEQA"). On April 11, 1974, petitioner District requested that it be furnished data by "the department preparing the report . . . at the earliest possible date." The first communication received by the District in response to this request was a negative declaration approved by the planning director on April 24, 1974. At the continued hearing before respondent Board on April 30, 1974, the District objected to the procedure followed in preparing the negative declaration, specifying the absence of an initial study in accordance with title 14, California Administrative Code, sections 15080 and 15083, lack of consultation with "all responsible agencies" pursuant to section 15066 and insufficient time for public response between the time the negative declaration was made available and approval of the project, as mandated by title 14, California Administrative Code, section 15083. The hearing was continued to May 21, 1974, to permit the District to appeal the negative declaration to the environmental report review committee of the planning department.

Petitioner District filed such an appeal on May 24, 1974, with the environmental quality advisory committee. In that appeal the District reasserted the above stated procedural objections and added its further objection based on the asserted lack of compliance with county guidelines[8] for processing environmental documents adopted in com-

---

[7]Section 56294 of the Government Code provides:

"At any time after the adoption of a resolution of certification pursuant to Section 56293, the board of supervisors may assume jurisdiction to initiate, conduct and complete any proceedings for the change of organization and to enforce compliance with any terms or conditions thereto referred to in such resolution. Upon the assumption of such jurisdiction, said board of supervisors and the clerk and other officers of the county shall have exclusive jurisdiction with respect thereto and may exercise all powers and duties vested in the board of directors of a conducting district and the clerk or other officers of such district. Any jurisdiction assumed and exercised by the board of supervisors and the clerk or other officers of the county pursuant to this section shall be given the same force and effect as if taken by the board of directors, if any, of a conducting district and the clerk or officers thereof."

[8]The matters cited included those specified in respect of the state guidelines and in addition an alleged lack of compliance with the requirement that an environmental assessment questionnaire be completed.

pliance with section 21082 of the Public Resources Code mandating the adoption of such guidelines. The District's appeal also presented its claims with respect to the applicability of CEQA to the detachment proceeding. It asserted that an environmental impact report was required because of impending development. The owner's alleged proposal to convert the property to agricultural use (planting to citrus) rather than the indicated residential development was characterized as one that could "be withdrawn at any point." The appeal adverted to the property as "prime developable property with good accessibility and adjacent to existing development and a college," and forecast that economic factors "will force the owner to maximize use of the property." The gravamen of the District's argument that the detachment would have a substantial environmental impact, however, can be summarized by the following quotation of one paragraph of its presentation:

"AESTHETIC, NATURAL AND SCENIC QUALITIES could be drastically affected inasmuch as there does not exist an agency with local recreation and open space policies comparable to those of the District. The District has the capability to acquire not only recreational lands but also open space and parkways. It has historically demonstrated its interest and concern through active programs of acquisition and maintenance."

In support of its argument, the District pointed out factors purportedly establishing its superiority over any other agency as an instrumentality to provide for park and recreational service in the area. Reference was made to the District's record of past accomplishments as compared to the unproven capabilities of a county service area in the Moorpark sphere or the anticipated future City of Moorpark. The recreation element of the Moorpark plan itself was criticized on the basis that it "calls for 5 acres of park land per 1,000 people in comparison to the District's 3.5 acres per 1,000 which will obviously increase significantly acquisition, development, maintenance and programming costs."

Alternatively, the District argued that provision for a substitute agency, such as "the establishment of a county service area, formation of an independent recreation and park district or incorporation as a City prior to approval of this project" was required, and asserted that

"[f]ailure to select one of these alternatives would unnecessarily create an adverse situation with respect to environmental protection and enhancement as there would be no agency in that area with a demonstrated capability of administering, maintaining, developing, and acquiring local park and recreational facilities as well as open space lands."

The District's appeal resulted in a hearing before the Environmental Report Review Committee but in no change to the negative declaration. The negative declaration pointed out that "[t]his action relates only to what jurisdiction will provide services to the area and will thus have negligible environmental impact." It added that "[t]he District has no general planning or zoning powers, nor does the District have a Quimby Act ordinance. These powers are reserved to Cities and Counties." It concluded that "[t]he detachment project will have no significant adverse environmental effects . . . ." A further hearing before the Board of Supervisors occurred on May 28, 1974, at which the District was represented. At the conclusion of that hearing the respondent Board adopted its resolution of that date ordering the detachment. The resolution found that there was no majority protest which would terminate the proceedings. It restated the Board's position that action by the Board was purely ministerial but noted that "a negative declaration has nonetheless been filed and this Board accepts and approves that negative declaration as a correct statement of the environmental consequences of the proposed detachment." The resolution stated various reasons for the Board's action. It noted that the detachment "is consistent with the Moorpark and Simi spheres of influence as established by LAFCO and the general plan of Moorpark and is consistent with this Board's efforts to create a well-balanced, well-planned and viable community in the Moorpark area." It asserted that "Ventura County has the capability to ensure adequate park and recreation facilities and detachment will allow a general purpose governmental entity, either the County or the future City of Moorpark, to provide coordinated governmental services to the Moorpark sphere of influence without fragmentation between several single purpose governmental agencies." The resolution further found "[t]here is no present development planned for the detached area."

The filing of the petition for writ of mandamus followed immediately after the adoption of the detachment resolution by respondent Board on May 28, 1974.

*Contentions*

With two exceptions,[9] all of the contentions urged in petitioner's 14 causes of action are still asserted as bases for nullifying the detachment proceedings. These contentions are:

1. The detachment proceedings are invalid due to the failure of respondent LAFCO and of respondent Board to comply with the requirements of CEQA for the preparation and consideration of an environmental impact report (hereinafter "EIR") or, in any event, a negative declaration, in accordance with state and local guidelines.

2. The District Reorganization Act (hereinafter "DRA") is an unconstitutional delegation of legislative power to LAFCOs.

3. DRA violates the provisions of section 11 of article XI of the California Constitution prohibiting the delegation to a private person or body power over municipal functions.

4. The residents of the remainder of the District cannot constitutionally be deprived of the right to vote on the detachment.

5. DRA prohibits LAFCO from mandating detachment of territory from the District without its consent and in disregard of its resolution disapproving detachment.

6. DRA prohibits LAFCO from mandating detachment of territory from the District without a vote of the residents when the District disapproves detachment.

---

[9]These are:

(a) Petitioners' assertion (seventh cause of action) that it was an abuse of discretion per se for respondents LAFCO and Board to order detachment at a time when development was expected to take place without making detachment conditional upon formation of another public agency authorized to provide park and recreation services in the detached territory. This assertion is restated in appellants' opening brief, but no argument is made in support of it. We, therefore, deem it abandoned.

(b) Petitioners' claim (10th cause of action) that the detachment was invalid because it did not provide for continued liability for outstanding indebtedness. This issue has been eliminated by petitioners' acceptance of the representation made in respondents' brief that any statement filed with respect to the change effected by the detachment, pursuant to sections 54900-54902 of the Government Code, will specify that the detached area remains obligated for the existing indebtedness of the District.

7. LAFCO's failure to establish and consider spheres of influence for the District and the adjacent governmental agencies invalidates its determination.

8. The decisions of LAFCO and of the Board are reviewable for abuse of discretion and subject to nullification because they are not supported by the weight of the evidence.

The issues posed by the above contentions, and respondents' contentions to the contrary, will be discussed herein in the order in which the contentions are above numbered. The issues posed with respect to the applicability of CEQA involve a threshold requirement which, if applicable and not complied with, renders any action of a public agency void. The three constitutional issues are next in order because no action of a LAFCO can be upheld if the powers granted to it are not constitutionally exercised. The next four issues involve interpretation of the DRA provisions delegating power to LAFCOs and to districts subject to their determinations. The eighth issue relates only to whether petitioners are entitled to have an independent review of the particular determination made in this case.

### CEQA Is Inapplicable to the Challenged Determinations

■ Numerous subissues are presented by the parties' various contentions concerning the applicability of CEQA and the sufficiency of the action taken in purported compliance therewith by respondent Board. Respondent LAFCO made no pretext of compliance. Its hearings were conducted and its determination made without the preparation of either a negative declaration or an EIR. It relies upon petitioners' failure to file any action challenging such determination within 180 days as required by Public Resources Code section 21167. Respondent Board, on the other hand, argues that its action carrying out the detachment after assumption of jurisdiction upon certification by respondent LAFCO was purely ministerial, and not a "discretionary" project subject to CEQA. Alternatively, respondent Board claims that it complied with CEQA by adopting and approving a negative declaration prepared by the county planning department. Petitioners, in turn, claim that the statute of limitations set forth in section 21167 of the Public Resources Code did not commence to run until respondent LAFCO's determination was implemented by the action of respondent Board and that the negative declaration was prepared in disregard of the requirements for the preparation thereof as set forth in the state and county guidelines.

None of the above subissues, however, is relevant unless the LAFCO determination directing initiation of the detachment proceedings or respondent Board's implementation of it constituted "projects proposed to be carried out or approved by public agencies," as defined in Public Resources Code section 21080. If there was no "project," there was no occasion to prepare either a negative declaration or an EIR.

Petitioners argue that "[a]ny governmental activity which results in some direct or ultimate physical impact on the environment is considered to be a project for purposes of CEQA." We disagree. The existence of a project cannot depend upon the outcome of the inquiry which the act contemplates only after the existence of a project is established. This court is not unmindful of the requirement that CEQA "be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language" (see our opinion in *People* ex rel. *Dept. Pub. Wks.* v. *Bosio,* 47 Cal.App.3d 495, 515 [121 Cal.Rptr. 375]), and "[i]t is, of course, too late to argue for a grudging, miserly reading of CEQA." (*Bozung* v. *Local Agency Formation Com.,* 13 Cal.3d 263, 274 [118 Cal.Rptr. 249, 529 P.2d 1017].) It is not, however, too late to recognize that CEQA was not intended to and cannot reasonably be construed to make a project of every activity of a public agency, regardless of the nature and objective of such activity. Such a construction would invoke the expensive and time-consuming procedures[10] required to complete at least a negative declaration in respect of virtually every action of a public agency. It is difficult to conceive of any such action which could not have "a potential for significant environmental effect" (the state guideline standard for determining when a project requires a negative declaration or an EIR).

The correct definition of a "project" under CEQA can be found in the two decisions of our Supreme Court which have discussed it. The first is *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247 [104 Cal.Rptr. 761, 502 P.2d 1049]. The argument that projects included "only situations in which the government itself engages in construction, acquisition or other development" (8 Cal.3d at p. 257) was rejected, the court holding: "[I]t is manifest that the word 'project' as used in section 21151 and other provisions of the EQA includes the issuance of permits, leases and other entitlements." (8 Cal.3d at p. 262.) In stating its conclusion as to the meaning of the words "they intend to carry out" in Public Resources

---

[10]See the state guidelines, 14 California Administrative Code section 15083.

Code section 21151, the court said: "Defendants and International contend that since 'project' is followed by the phrase 'they intend to carry out,' section 21151 can only be interpreted as referring to a public works type project 'to be carried out,' i.e., constructed, acquired or developed, by the government. However, having interpreted the word 'project' broadly to include private activity for which a permit is necessary, certainly the granting or denying of a permit is an act which a governmental authority 'carries out.' Accordingly, we construe the phrase following 'project' to mean only that *before an environmental impact report becomes required the government must have some minimal link with the activity, either by direct proprietary interest or by permitting, regulating, or funding private activity.* [Fn. omitted.]" (8 Cal.3d at pp. 262-263.) (Italics added.)

The court thus defined "projects" as "public works type" projects to be "constructed, acquired or developed, by the government" and like projects of private parties with which the government has the required "minimal link." Except in cases where the government itself is engaged in a "public works type project," the required "minimal link with the activity" is that a government agency take action (in the nature of the issuance of a permit, the making or changing of a regulation, or the provision of funding) *necessary to the carrying out* of some private project involving a physical change in the environment.

In *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, our Supreme Court considered the application of CEQA to a LAFCO approval of annexation of property located in an unincorporated area of Ventura County by the City of Camarillo. As in this case, demurrers were sustained without leave to amend to a petition for writ of mandate. The petition sought to require LAFCO to certify an environmental impact report before approving the City's annexation. The allegations of the complaint as described by the court included not only the fact that the annexed area "would be used 'for residential, commercial and recreational uses,' and that such development was 'anticipated . . . in the near future,' " (13 Cal.3d at pp. 269-270), but as well the fact that such development depended upon approval of and completion of the annexation. The court said in this respect: "No one makes any bones about the fact that the impetus for the Bell Ranch annexation is Kaiser's desire to subdivide 677 acres of agricultural land, a project apparently *destined to go nowhere in the near future as long as the ranch remains under county jurisdiction.* The city's and Kaiser's application to LAFCO

shows that this agricultural land is proposed to be used for 'residential, commercial and recreational' purposes. Planning was completed, preliminary conferences with city agencies had progressed 'sufficiently' and development in the near future was anticipated. In answer to the question whether the proposed annexation would result in urban growth, the city answered: 'Urban growth will take place in designated areas and only within the annexation.'[23]" (Italics added.)(13 Cal.3d at p. 281.)

The court held that the LAFCO approval of the annexation was a project undertaken by LAFCO which constituted an entitlement for use requiring preparation of an EIR because it might have a significant effect on the environment. It made clear, however, that it was dealing only with the "activity under examination in this case" (13 Cal.3d at p. 277), and added: "First and foremost, we point out that we are not dealing with an abstract problem. Again, this case does not involve—as the tone of some of defendants' arguments suggest—the question whether any LAFCO approval of any annexation to any city may have a significant effect on the environment. This is not the case of a rancher who feels that his cattle would chew their cuds more contentedly in an incorporated pasture." (13 Cal.3d at p. 281.)

The decision, therefore, does not make every LAFCO approval a project subject to CEQA; nor does it make every LAFCO approval of local agency boundary changes, the timing of which may coincide with intended development, such a project. It dealt only with the situation where LAFCO approval was a necessary step in the development and in effect constituted an entitlement for use for such development.

The detachment proceedings in this case constituted activities of both LAFCO and of respondent Board. However, no facts alleged or otherwise shown suggest that the availability of the property in the detached area for development in any respect depends upon the detachment. Petitioners have merely claimed that the action was taken "just as development is starting to take place or can be expected to take place in the area proposed for detachment." This allegation, however, is

"[23]It would be entirely wrong to infer that there is anything underhanded or illegal in this pre-annexation cooperation between Kaiser and Camarillo. Government Code section 65859 specifically provides for the prezoning of unincorporated territory adjoining a city 'for the purpose of determining the zoning that will apply to such property in the event of subsequent annexation . . . .' Nor do we mean to imply that Camarillo has somehow bargained away its responsibilities with respect to such decisions as must be made before Kaiser's plans can become a reality."

far from an allegation that the proposed development was dependent upon the detachment; it is clear that the contrary was true. Unlike the situation in *Bozung* (where the annexation removed the property from the zoning authority of the county which blocked development into the City of Camarillo which had prezoned it so as to permit the development), detachment in this case did not make any change whatever in the uses to which the land might be put. The property was within the zoning jurisdiction of the county, both before and after the detachment, and the land use therein permitted by the county was "open space or agriculture." Moreover, petitioner District had no authority over the use of the land in the detached area by virtue of its inclusion in such district, its powers being limited to those enumerated in Public Resources Code section 5782.2.

The evaluation process contemplated by CEQA relates to the effect of proposed changes in the physical world which a public agency is about to either make, authorize or fund, not to every change of organization or personnel which may affect future determinations relating to the environment. The determinations of respondent LAFCO and of respondent Board were in the latter category and were not "projects" which they proposed to carry out. There was, therefore, no need for a negative declaration or an EIR since neither requirement is applicable if there is no project subject to CEQA. We may, therefore, summarily dispose of the subissues relating to CEQA set forth above.

Petitioners' challenge to the determination of respondent LAFCO is in any event barred by the statute of limitations embodied in section 21167 of the Public Resources Code which requires that any action attacking the validity of the action of any public agency based upon CEQA be brought within 180 days from the time said action is taken. The petition herein was not filed until more than eight months after the LAFCO resolution approving the detachment. Petitioners' argument that the cause of action did not arise until LAFCO's decision was implemented by respondent Board is disposed of by the decision in *Bozung* holding that a LAFCO determination which is subject to CEQA is itself a project subject to nullification by writ of mandate. The cause of action clearly arose when the determination was made.

Petitioners' reliance upon CEQA to nullify the action of respondent Board is misplaced for still another reason. Respondent Board is correct in its assertion that its action was purely ministerial and therefore exempt

from CEQA requirements,[11] even if it otherwise qualified as a project. Government Code section 56274 makes it "mandatory for the board of directors of the conducting district or the board of supervisors, as the case may be, to take proceedings for the change of organization" approved by LAFCO. In the case of a detachment, such proceedings can only result in a resolution ordering the territory detached if there is no majority protest (Gov. Code, § 56319), though disapproval is permitted in respect of annexations (Gov. Code, § 56319.1). Consequently, the provisions of section 56294 of the Government Code, stating that, "[a]t any time after the adoption of a resolution of certification . . . the board of supervisors may assume jurisdiction . . ." do not make such action discretionary. It must be construed merely as specifying that such assumption may occur "at any time" after adoption of such resolution of certification.

The negative declaration prepared for and adopted by respondent Board does not, however, aid respondents' case. If the respective future capabilities of petitioner District and of alternative agencies to provide recreational facilities were required to be considered under CEQA, we would not be prepared to say that the petition failed to show there was a question which could be "fairly argued," in view of "the existence of serious public controversy." (*No Oil, Inc.* v. *City of Los Angeles,* 13 Cal.3d 68, 75, 85 [118 Cal.Rptr. 34, 529 P.2d 66].) A negative statement would, therefore, not suffice.

Finally, if a negative statement were appropriate, the allegations supporting petitioners' numerous objections to the procedure employed appear to have sufficient substance to preclude sustaining a demurrer without leave to amend.[12]

Our conclusion, therefore, that the demurrer was properly sustained as to the causes of action based upon CEQA is based upon (1) the total inapplicability of CEQA to the detachment proceedings under the circumstances alleged, (2) the statute of limitations applicable to any challenge to the determination of respondent LAFCO, and (3) the ministerial character of the action taken by respondent Board.

[11]Public Resources Code section 21080 provides in subdivision (a), "this division shall apply to discretionary projects" and in subdivision (b), "This division shall not apply to ministerial projects proposed to be carried out or approved by public agencies."

[12]It was alleged, for example, that in violation of the state guidelines there was no consultation with other agencies, such as, for example, respondent LAFCO in respect of the preparation of the negative declaration.

*The Delegation of Legislative Power to*
*LAFCOs in the DRA Is Not Unconstitutional*

█ The DRA (Gov. Code, §§ 56000-56550) governs all changes of organization of districts such as petitioner District. Section 56250 thereof (1) invokes the powers granted LAFCOs under the Knox-Nisbet Act (Gov. Code, §§ 54773-54799.5), (2) expands them to include proceedings "to review and approve or disapprove, with or without amendment, wholly, partially or conditionally . . . proposals for changes of organization" of districts, and (3) requires that such powers, except as otherwise provided, "shall be exercised in accordance with the provisions of" Knox-Nisbet. The provisions, therefore, of Knox-Nisbet defining the powers therein delegated to LAFCOs apply to the exercise of such powers in determinations relating to district annexations and detachments.

The provisions of Knox-Nisbet empowering LAFCOs to make determinations with respect to local agency boundaries charge LAFCOs with the duty of carrying out stated purposes and contain detailed specifications of matters to be considered in connection therewith. Government Code section 54774 states the purposes as follows: "Among the purposes of a local agency formation commission are the discouragement of urban sprawl and the encouragement of the orderly formation and development of local governmental agencies based upon local conditions and circumstances." More specifically, in mandating the development of spheres of influence in each county, said section states: "In order to carry out its purposes and responsibilities for planning and shaping the logical and orderly development and coordination of local governmental agencies so as to advantageously provide for the present and future needs of the county and its communities, the local agency formation commission shall develop and determine the sphere of influence. . . ." In this latter connection, eight specific factors are required to be considered.

Government Code section 54796 governs LAFCOs' consideration of all proposals and it details eight categories of factors to be considered. The authority delegated to LAFCOs is, therefore, that of making determinations "based upon local conditions and circumstances," which will promote "the logical and orderly development and coordination of local governmental agencies so as to advantageously provide for the present and future needs of the county and its communities" (Gov. Code, § 54774), taking into account all the factors specified in the 16

subdivisions of section 54774 and 54796 of the Government Code. However, since many of the factors may relate to matters other than the planning function, it has been held in *Meyers* v. *Local Agency Formation Com.,* 34 Cal.App.3d 955, 960 [110 Cal.Rptr. 422], that LAFCO's consideration of these numerous factors is limited "to considering the criteria set forth . . . only as they relate to the planning function."

The standard for judging the validity of delegation of legislative power is stated by our Supreme Court in *Kugler* v. *Yocum,* 69 Cal.2d 371, 375-377 [71 Cal.Rptr. 687, 445 P.2d 303], as follows: "At the outset, we note that the doctrine prohibiting delegation of legislative power, although much criticized as applied (see, e.g., Witkin, Summary of Cal. Law (7th ed. 1960) p. 1834; 1 Davis, Administrative Law Treatise (1958) § 2.01), is well established in California. 'The power . . . to change a law of the state is necessarily legislative in character, and is vested exclusively in the legislature and cannot be delegated by it . . . .' (*Dougherty* v. *Austin* (1892) 94 Cal. 601, 606-607 [28 P. 834, 29 P. 1092, 16 L.R.A. 161].) . . . .

"Several equally well established principles, however, serve to limit the scope of the doctrine proscribing delegations of legislative power. For example, legislative power may properly be delegated if channeled by a sufficient standard. 'It is well settled that the legislature may commit to an administrative officer the power to determine whether the facts of a particular case bring it within a rule or standard previously established by the legislature . . . .' (*Dominguez Land Corp.* v. *Daugherty* (1925) 196 Cal. 468, 484 [238 P. 703]; see also *State Board of Dry Cleaners* v. *Thrift-D-Lux Cleaners, Inc.* (1953) 40 Cal.2d 436, 448 [254 P.2d 29]; Case Note (1959) 6 U.C.L.A.L.Rev. 312 and cases cited therein.)

"A related doctrine holds: 'The essentials of the legislative function are the determination and formulation of the legislative policy. Generally speaking, attainment of the ends, including how and by what means they are to be achieved, may constitutionally be left in the hands of others. The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the "power to fill up the details" by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect . . . .' (*First Industrial Loan Co.* v. *Daugherty* (1945) 26 Cal.2d 545, 549 [159 P.2d 921].) Similarly, the cases establish that '[w]hile the legislative body cannot delegate its power to make a law, it can make a law to delegate a power to determine some fact or state of things upon which the law

makes or intends to make its own action depend.' (*Wheeler* v. *Gregg* (1949) 90 Cal.App.2d 348, 363 [203 P.2d 37].)

"We have said that the purpose of the doctrine that legislative power cannot be delegated is to assure that 'truly fundamental issues [will] be resolved by the Legislature' and that a 'grant of authority [is] . . . accompanied by safeguards adequate to prevent its abuse.' (*Wilke & Holzheiser, Inc.* v. *Department of Alcoholic Beverage Control* (1966) 65 Cal.2d 349, 369 [55 Cal.Rptr. 23, 420 P.2d 735]; see also Jaffe, *An Essay on Delegation of Legislative Power* (1947) 47 Colum.L.Rev. 359, 561; 1 Davis, Administrative Law Treatise, supra, § 2.15; *Gaylord* v. *City of Pasadena* (1917) 175 Cal. 433, 437 [166 P. 348]; *Warren* v. *Marion County* (1960) 222 Ore. 307, 313-315 [353 P.2d 257]; *Lien* v. *City of Ketchikan* (Alaska 1963) 383 P.2d 721, 723-724; *Group Health Ins.* v. *Howell* (1963) 40 N.J. 436, 445, 447 [193 A.2d 103]; *Heath* v. *Mayor & City Council of Baltimore* (1946) 187 Md. 296, 303 [49 A.2d 799] (dictum).) This doctrine rests upon the premise that the legislative body must itself effectively resolve the truly fundamental issues. It cannot escape responsibility by explicitly delegating that function to others or by failing to establish an effective mechanism to assure the proper implementation of its policy decisions."

More recently, in *People* ex rel. *Younger* v. *County of El Dorado*, 5 Cal.3d 480, 507 [96 Cal.Rptr. 553, 487 P.2d 1193], our Supreme Court said: "The doctrine prohibiting delegations of legislative power is not violated if the Legislature makes the fundamental policy decisions and leaves to some other body, public or private, the task of achieving the goals envisioned in the legislation. *(Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 375-377 [71 Cal.Rptr. 687, 445 P.2d 303].) Here, three Legislatures have jointly determined the goals which the Agency is to achieve. Article I of the Compact sets forth the aims which the Agency is to promote; article V specifies that those ends are to be achieved primarily through the formulation and enforcement of a regional plan having certain prescribed and correlated elements. Finally, the powers specified in article VI are conferred 'to effectuate the adopted regional . . . .' plan. Where the Legislature has so carefully set forth its decision on the basic policy issues, it surely may delegate the duty of carrying out its command to an administrative body such as the Agency."

The statement of goals in Article I of the Tahoe Regional Planning Compact (Gov. Code, §§ 66800-66801) was as follows: "It is further

found and declared that there is a need to maintain an equilibrium between the region's natural endowment and its manmade environment, to preserve the scenic beauty and recreational opportunities of the region, and it is recognized that for the purpose of enhancing the efficiency and governmental effectiveness of the region, it is imperative that there be established an areawide planning agency with power to adopt and enforce a regional plan of resource conservation and orderly development, to exercise effective environmental controls and to perform other essential functions, as enumerated in this title." (Gov. Code, § 66801.)

The provisions of Article V referred to by the court simply enjoined the adoption of a regional plan and specified that the special commission "shall take account of and shall seek to harmonize the needs of the region as a whole," and that the plan should include five specified elements (e.g., a land use plan, transportation plan, etc.). Article VI simply authorized the governing body to place the plan in effect.

In *CEEED* v. *California Coastal Zone Conservation Com.*, 43 Cal.App.3d 306 [118 Cal.Rptr. 315], the provisions of the Coastal Zone Conservation Act of 1972 (Pub. Resources Code, § 27000 et seq.) delegating authority to the Coastal Commission to issue or deny permits were upheld as against a claim of unconstitutional delegation. The court said (43 Cal.App.3d at pp. 325-328):

"Plaintiffs contend that the Act unlawfully delegates legislative power to the Commission by failing to provide adequate standards governing the exercise of the powers conferred upon it over issuance of permits. They charge that the statutory criteria set out in section 27402 confer unbridled discretion upon the Commission and are unconstitutionally vague. The contentions are devoid of merit.

"The constitutional doctrine prohibiting delegation of legislative power rests on the premise that the Legislature may not abdicate its responsibility to resolve the 'truly fundamental issues' by delegating that function to others or by failing to provide adequate directions for the implementation of its declared policies. (*Kugler* v. *Yocum*, 69 Cal.2d 371, 376-377 [71 Cal.Rptr. 687, 445 P.2d 303].) Consequently, where the Legislature makes the fundamental policy decision and delegates to some other body the task of implementing that policy under adequate safeguards, there is no violation of the doctrine. (*People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d 480, 507 [96 Cal.Rptr. 553, 487 P.2d 1193]; *Kugler* v. *Yocum, supra,* at pp. 375-377.)

"As heretofore noted the Coastal Initiative was patterned closely after the McAteer-Petris Act establishing the San Francisco Bay Conservation and Development Commission. That act declared that the uncoordinated, haphazard filling of the bay constituted a threat to navigation, wildlife and the quality of the waters of the bay and that formulation of a comprehensive plan was essential to the conservation of the bay and shoreline. It established a permit system to control the placing of fills or the extraction of submerged materials pending adoption of a comprehensive plan. (Gov. Code, §§ 66601-66604.) It provided that a permit may be granted 'if the project is either (1) necessary to the health, safety, or welfare of the public in the entire bay area, or (2) of such a nature that it will not adversely affect the comprehensive plan being prepared.' (Gov. Code, § 66632, subd. (d).)

"In responding to an attack upon the validity of the McAteer-Petris Act on the ground of unlawful delegation of legislative powers to the Bay Conservation and Development Commission, the Court of Appeal in *Candlestick Properties, Inc.* v. *San Francisco Bay Conservation etc. Com., supra,* 11 Cal.App.3d 557, 568 [89 Cal.Rptr. 897], held: 'Clearly, there has been no attempt to vest in the commissioners an arbitrary power, or an uncontrolled and unguided discretion in matters concerning the functioning of the Commission in studying the development of the San Francisco Bay and in determining whether to grant a request for a permit to fill bay lands because adequate standards have been set forth in the act.' The court noted that in an earlier case arising under the act, the Supreme Court had observed: 'The "objective sought to be achieved" by the McAteer-Petris Act is depicted with remarkable clarity.' (*People* ex rel. *S.F. Bay etc. Com.* v. *Town of Emeryville,* 69 Cal.2d 533, 544 [72 Cal.Rptr. 790, 446 P.2d 790].)

"Standards for the issuance of building and land use permits couched in general health, safety or welfare terms similar to those upheld in *Candlestick* have been uniformly upheld against the charge that they confer unbridled discretion on the administrative body or are unconstitutionally vague. (*City & County of S.F.* v. *Superior Court,* 53 Cal.2d 236, 250 [1 Cal.Rptr. 158, 347 P.2d 294]; *Garavatti* v. *Fairfax Planning Com.,* 22 Cal.App.3d 145, 150 [99 Cal.Rptr. 260]; *City of Santa Clara* v. *Santa Clara Unified Sch. Dist.,* 22 Cal.App.3d 152, 163 [99 Cal.Rptr. 212]; *Mitcheltree* v. *City of Los Angeles,* 17 Cal.App.3d 791, 797 [95 Cal.Rptr. 76]; *Van Sicklen* v. *Browne,* 15 Cal.App.3d 122, 126-127 [92 Cal.Rptr. 786]; *Stoddard* v. *Edelman,* 4 Cal.App.3d 544, 548 [84 Cal.Rptr. 443].)

"The Coastal Initiative sets out the goals to be achieved and the standards for permit issuance with the same, if not greater, clarity than expressed in the McAteer-Petris Act. (Jackson & Baum, *Regional Planning: The Coastal Zone Initiative Analyzed in Light of the BCDC Experience,* 47 State Bar J. 427, 488-490.) Before a permit is issued, the regional commission must find both: '(a) [t]hat the development will not have any substantial adverse environmental or ecological effect' and '(b) [t]hat the development is consistent with the findings and declarations set forth in Section 27001 and with the objectives set forth in Section 27302.' (§ 27402.)

"The statutory objectives expressed in section 27302 are: preservation, restoration and enhancement of the coastal zone environment, including its aesthetic values; encouragement of optimum population of living organisms; balanced and orderly use of coastal resources; and avoidance of 'irreversible and irretrievable commitments' of those resources.

"The 'substantial adverse environmental or ecological effect' standard is more specific than the broad 'health, safety, or general welfare' guideline upheld in *Candlestick* and the cases cited above. Although application of the standard calls for the exercise of judgment and discretion, by the very nature of the legislative goals, considerable discretion must of necessity be vested in the Commission. As the court in *Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 271 [104 Cal.Rptr. 761, 502 P.2d 1049], said of the 'significant effect on the environment' phrase in the California Environmental Quality Act: 'To some extent this is inevitable in a statute which deals, as the EQA must, with questions of degree.' The statutory criteria to be observed by the Commission and the regional commissions in carrying out the tasks delegated to them clearly satisfy constitutional requirements. The fact that the Commission is required to weigh complex factors in determining whether a development will have a substantial adverse environmental or ecological effect does not, as plaintiffs charge, mean that unbridled discretion has been conferred on it. A statute empowering an administrative agency to exercise a judgment of a high order in implementing legislative policy does not confer unrestricted powers. (See *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind,* 67 Cal.2d 536, 548 [63 Cal.Rptr. 21, 432 P.2d 717].)

"Plaintiffs' reliance upon *Bayside Timber Co.* v. *Board of Supervisors,* 20 Cal.App.3d 1 [97 Cal.Rptr. 431], is misplaced. That case involved a

statute delegating rule-making powers to an administrative agency whose membership was composed of industry members. As we noted in *Allen* v. *California Board of Barber Examiners*, 25 Cal.App.3d 1014, 1020 [102 Cal.Rptr. 368], in such situations courts insist upon more stringent standards to contain and guide the exercise of delegated powers. (See *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control*, 65 Cal.2d 349, 367 [55 Cal.Rptr. 23, 420 P.2d 735]; *State Board* v. *Thrift-D-Lux Cleaners*, 40 Cal.2d 436, 448-449 [254 P.2d 29].) [Fns. omitted.]"

Petitioners' reliance upon *Bayside Timber Co.* v. *Board of Supervisors*, 20 Cal.App.3d 1 [97 Cal.Rptr. 431], is similarly misplaced in this appeal. Unlike the situation in *Bayside Timber Co.*, where timber owners were, "in their absolute discretion," given "the exclusive power to formulate forest practice rules which, when adopted, have the force and effect of law," with "no guides or standards to prevent its abuse" (20 Cal.App.3d at p. 10), the delegation of authority to LAFCOs made by DRA here in issue limits their discretion by requiring that it be exercised "for planning and shaping the logical and orderly development and coordination of local governmental agencies so as to advantageously provide for the present and future needs of the county and its communities . . ." (Gov. Code, § 54774.) The standard is at least as specific as those found adequate in *Younger* and *CEEED* and in the cases discussed therein. Moreover, the DRA provides means to prevent abuse of the powers so delegated. Government Code section 56006 subjects LAFCO determinations to court review for abuse of discretion. We, therefore, conclude that DRA makes no unconstitutional delegation of legislative authority.

*DRA Does Not Violate the Provisions of Article XI, Section 11 of the California Constitution*

■ Though petitioners cite article XI, section 11 and quote it as adopted in 1970, their argument is based upon the language of former article XI, section 13, which was repealed at the same time. The present section relates solely to the delegation of power to "a private person or body." Former section 13 prohibited delegation of power over municipal affairs "to any special commission, private corporation, company, association or individual . . . ." Our Supreme Court pointed out this change in the law in *People* ex rel. *Younger* v. *County of El Dorado*, *supra*, 5 Cal.3d at p. 500 (fn. 22), stating: "[I]t is obvious that the Compact cannot violate present section 11." It is equally obvious that the delegation of authority to LAFCOs cannot violate article XI, section 11.

In *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, our Supreme Court specifically held LAFCOs were governmental agencies. Perhaps a LAFCO might have been classified as a "special commission" under former section 13, but petitioners have suggested no reason for applying the former section 13 to test the validity of the exercise of respondent LAFCO's powers over two years after its repeal.

We need not, therefore, rely upon the distinction between "purely local matters" and regional matters, on the basis of which former section 13 was held inapplicable, in any event, in *Younger.* Such distinction would, however, equally justify the delegation here involved. The very reason that was found in *Younger* to make the Tahoe Compact a matter of regional concern, "the inability of the myriad of local entities to cope with the problem" (5 Cal.3d at p. 501), is likewise applicable to Knox-Nisbet which was enacted to prevent the "urban sprawl" which resulted from leaving local municipalities free to compete for territory.

*There Was No Unconstitutional Deprivation of the Right to Vote*

Section 56252 of the Government Code specifically authorizes LAFCOs to determine that any election which may be called upon the question of confirming an annexation or detachment be held either "(a) Only within the territory ordered to be annexed or detached; or (b) Both within the territory ordered to be annexed or detached and within all or such part of said district as is outside of such territory." Pursuant to this authority, the resolution of respondent LAFCO in this case specified that "[a]ny election called to pass upon the question of confirming the subject detachment shall be called, held and conducted upon such question only within the territory ordered to be detached." The effect of this determination was to deny residents and property owners of the remainder of the district participation in any election to confirm the detachment. The resolution of respondent Board ordered "said detachment to be effective forthwith without an election." This action was authorized by section 56320 of the Government Code, since the property was classified as uninhabited (see Gov. Code, § 56074) and no written protests were received from landowners within the detached territory.

Petitioners assert deprivation of the rights of residents of the remainder of the district to vote in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution and the correlative provisions of the California Constitution (Cal. Const., art. I,

§ 7, formerly §§ 11, 21), in the determination by LAFCO to limit the election to the detached territory. Petitioners rely upon *Curtis* v. *Board of Supervisors,* 7 Cal.3d 942 [104 Cal.Rptr. 297, 501 P.2d 537], and the numerous decisions of the United States Supreme Court therein cited, for the proposition that classifications which " 'burden' the right to vote . . . must be examined under the strict equal protection standards"; that is, it must be shown that the classification "rests upon a compelling state interest and is necessary to further any such interest." (7 Cal.3d at p. 955.) Petitioners further argue that the differences between the interests of inhabitants and owners of land in the detached area and those of the residents in the remainder of the district do not justify a classification denying the franchise to the latter.

Respondents argue that inasmuch as no election was ordered in this case, the rule applicable is that stated by our Supreme Court in *Weber* v. *City Council,* 9 Cal.3d 950 [109 Cal.Rptr. 553, 513 P.2d 601]. It was there held there was no constitutional right to vote on annexation procedures; consequently, classifications determining when an election was required must be upheld if they bear "a rational relationship to a legitimate state purpose." (9 Cal.3d at p. 959.) Respondents' argument overlooks the fact that petitioner District was the conducting district specified by Government Code section 56291 with power to order an election of the scope authorized by the determination made by LAFCO. Thus, petitioner could, if compelled to order detachment, have made the order subject to confirmation by an election in the entire district if the LAFCO determination had not prevented such an election. The action, therefore, of respondent LAFCO constituted a classification burdening the exercise of the franchise in an election, not a classification preventing an election.

This does not mean, however, that this classification must be justified on the basis of the so-called "strict standards" found applicable in *Curtis.* The decision in *Curtis* was based upon a series of United States Supreme Court cases involving restrictions upon the franchise relating to local governments possessing general powers or powers of comparable significance. After discussing four such cases (*Kramer* v. *Union School District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]; *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]; *Evans* v. *Cornman* (1970) 398 U.S. 419 [26 L.Ed.2d 370, 90 S.Ct. 1752]; *Phoenix* v. *Kolodziejski* (1970) 399 U.S. 204 [26 L.Ed.2d 523, 90 S.Ct. 1990]), our Supreme Court was careful to point out that the rule it was establishing was not necessarily applicable to special districts with limited powers. It said in this connection (7 Cal.3d at pp. 958-960):

"Turning from federal to California cases, respondents contend that the Court of Appeal decision in *Schindler* v. *Palo Verde Irrigation Dist.* (1969) 1 Cal.App.3d 831 [82 Cal.Rptr. 61], established the validity of a voting system based on assessed value of land. *Schindler* upheld that method of selection of the board of trustees of an irrigation district on the ground that 'the benefits and burdens accrue to each landowner in proportion to the extent of land owned.' (1 Cal.App.3d at p. 839; see also *Thompson* v. *Board of Directors* (1967) 247 Cal.App.2d 587, 593-594 [55 Cal.Rptr. 689].) The court pointed out that '[t]he state clearly has a compelling interest in the reclamation of waste lands through flood protection, drainage and irrigation works.' Furthermore, the lands which were to be reclaimed were virtually uninhabited. The court concluded that the 'grant of election franchise to land owners, resident and nonresident, corporate and individual, is necessary to "further a compelling state interest." ' (1 Cal.App.3d at p. 839.)

"In contrast to the irrigation district, which is composed of landowners who pursue their special interests in the reclamation of their land, the City of Rancho Palos Verdes consists of those who pursue the overall interests of citizens in their government. Rancho Palos Verdes will constitute a city of general governmental powers; its actions plainly concern nonlandowners as well as landowners; neither the benefits of city government nor its burdens can fairly be said to be directly proportional to the assessed value of land or to the special interests of landowners. (See *Burrey* v. *Embarcadero Mun. Improvement Dist.* (1971) 5 Cal.3d 671, 682, fn. 8 [97 Cal.Rptr. 203, 488 P.2d 395].)

"In this connection respondents lay particular emphasis on special districts of limited powers, pointing to some 42 statutes which restrict the right to sign petitions or instruments of protest to landowners. We point out that for the most part these statutes involve special districts that cater to, and express, special interests. *Our holding in the instant case pertains to the validity of a restricted franchise as to the formation of a city of general powers and does not necessarily apply to special districts, whose design, powers and methods of financing are more closely related to ownership of land.* (See *Avery* v. *Midland County* (1968) 390 U.S. 474, 484 [20 L.Ed.2d 45, 53, 88 S.Ct. 1114].)

"From our review of these cases we draw a general principle: that all residents share a substantial interest in the government of their state, city, county, school district, and other agencies of general governmental

power, and in the issuance of bonds by these entities. Consequently the special concern of the landowners as to the level of taxes upon real property cannot justify exclusion of the nonlandowner nor the proportionate reduction of the vote of owners of less valuable property. [Fns. omitted.]" (Italics added.)

Apparently the Supreme Court was aware at the time of this decision of the pendency in the United States Supreme Court of the appeal in *Salyer Land Co.* v. *Tulare Water District* (1973) 410 U.S. 719 [35 L.Ed.2d 659, 93 S.Ct. 1224]. In that case the United States Supreme Court upheld the validity of a restricted franchise in respect of the election of directors of a limited powers water storage district. The franchise was limited to landowners and the vote of landowners was weighted according to assessed valuation of their land. The United States Supreme Court noted, as did our Supreme Court, that the applicability of the strict standard had been left open in *Avery* v. *Midland County* (1968) 390 U.S. 474, 484 [20 L.Ed.2d 45, 53, 88 S.Ct. 1114]. Concluding that the strict standard was not applicable, the court said (410 U.S. at pp. 728-730 [35 L.Ed.2d at pp. 666-668]):

"We conclude that the appellee water storage district, by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group, is the sort of exception to the rule laid down in *Reynolds* which the quoted language from *Hadley, supra,* and the decision in *Avery, supra,* contemplated.

"The appellee district in this case, although vested with some typical governmental powers, has relatively limited authority. Its primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin. It provides no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body. App. 86. There are no towns, shops, hospitals, or other facilities designed to improve the quality of life within the district boundaries, and it does not have a fire department, police, buses, or trains. *Ibid.*

"Not only does the district not exercise what might be thought of as 'normal governmental' authority, but its actions disproportionately affect landowners. All of the costs of district projects are assessed against land by assessors in proportion to the benefits received. Likewise, charges for

services rendered are collectible from persons receiving their benefit in proportion to the services. When such persons are delinquent in payment, just as in the case of delinquency in payments of assessments, such charges become a lien on the land. Calif. Water Code §§ 47183, 46280. In short, there is no way that the economic burdens of district operations can fall on residents *qua* residents, and the operations of the districts primarily affect the land within their boundaries.

. . . . . . . . . . . . . . . . . . . . .

"We hold, therefore, that the popular election requirements enunciated by *Reynolds, supra,* and succeeding cases are inapplicable to elections such as the general election of appellee Water Storage District.

"Even though appellants derive no benefit from the *Reynolds* and *Kramer* lines of cases, they are, of course, entitled to have their equal protection claim assessed to determine whether the State's decision to deny the franchise to residents of the district while granting it to landowners was 'wholly irrelevant to achievement of the regulation's objectives,' *Kotch* v. *River Port Pilot Comm'rs,* 330 U.S. 552, 556 (1947). [Fns. omitted.]"

Like the Tulare Water District, petitioner District provides a single service of the type ordinarily financed by a municipal body, to wit park and recreational facilities, but it provides no other general public services. Like water districts, recreation and park districts are classified as districts of "limited powers." (Gov. Code, § 56040.) The validity, therefore, of the classification of qualified electors entitled to vote with respect to confirmation of the annexation is properly determined on the basis of the rule that "the classification need only bear a rational relationship to a conceivable legitimate state purpose." (*Curtis* v. *Board of Supervisors, supra,* 7 Cal.3d at pp. 951-952.)

Petitioners have cited no authority suggesting that there is anything unconstitutional per se in delegating legislative authority to make classifications. We have already held that the delegation of legislative authority in this case is valid, in view of the sufficiency of the standard and the safeguards against abuse provided with respect thereto. The sole question remaining, then, is whether there are alleged any facts which are sufficient to sustain petitioners' attack upon the classification made, applying the traditional standard. That standard is stated by our

Supreme Court in *Weber* v. *City Council, supra,* 9 Cal.3d at page 961: "The applicable standard here involved is instead the traditional one: 'The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally . . . and their statutory classifications will be set aside only if no grounds can be conceived to justify them. [Citations.]' (*McDonald* v. *Board of Election, supra,* 394 U.S. at p. 809 [22 L.Ed.2d at pp. 745-746].)" In applying this traditional test in *Younger, supra,* our Supreme Court said (5 Cal.3d at p. 502): "As we recently said, the concept of equal protection of the laws means simply 'that persons similarly situated with respect to the legitimate purpose of the law receive like treatment.' (*Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645].)"

The facts alleged show no basis for invalidating the classification made by respondent LAFCO when it determined that any election with respect to the detachment be conducted only in the detached area. No facilities of any kind had been provided by petitioner District in the detached area. The property contained therein remained subject to liability to pay the existing obligations of the District. As the resolution of respondent Board noted, detachment "would not infringe on any interest of the district except as it relates to the district's tax base," a matter concerning only the financing of future improvements within the remainder of the District or the provision of services therein. By comparison the interests of the owners of property in the detached area were of a primary and more significant nature. At stake were the availability of that territory for integration into a planned community and the receipt thereby of the direct benefits that such integration would entail, in all spheres of governmental action, not merely the provision of recreation and park facilities. There was, moreover, a significant, even compelling, state interest in providing a method of adjusting special district boundaries in the context of a regional and non-self-interest perspective, thereby to curb the parochialism and self-interest of local units which had produced the "urban sprawl" and "the wasteful duplication of services that results from indiscriminate formation of new local agencies or haphazard annexation of territory to existing local agencies." (*City of Ceres* v. *City of Modesto,* 274 Cal.App.2d 545, 553 [79 Cal.Rptr. 168].)

In view of the minimal number of possible electors in the detached area (only five people lived there), in comparison to the number of

residents in petitioner District, which included the City of Simi Valley, it is apparent that an election which included the residents of the remainder of the district would have been one in which the selfish interest of such residents would wholly determine the result. The legitimate state purpose (expressed in Knox-Nisbet) of having the boundary determined on the basis of "the logical and reasonable development . . . of local governmental agencies so as to advantageously provide for the present and future needs of each county and its communities" (Gov. Code, § 54774) bore a rational relationship to the classification made.

*The. DRA Empowers LAFCO to Mandate Detachment by the District Without its Consent and in Disregard of its Disapproval*

■ The contention of petitioner District that it has power and discretion to disapprove and prevent a detachment which has been approved by LAFCO ignores the express provisions of DRA to the contrary. Government Code section 56274 expressly makes it "mandatory for the board of directors of the conducting district or the board of supervisors, as the case may be, to take proceedings for the change of organization or reorganization in accordance with Part 5 (commencing with section 56290) hereof, subject to compliance with the commission's resolution making determinations." Except where a "majority protest" is received (Gov. Code, § 56316) requiring the proposal be abandoned, the conducting agency has no power to make any determination other than to adopt a resolution ordering the territory detached, either with or without an election in accordance with sections 56320 and 56321. Government Code section 56319[13] provides that the power of the conducting district with respect to a proposed detachment is less than its power with respect to a proposed annexation, in respect of which it may make, under Government Code section 56319.1,[14] a determination "[d]isapproving the proposed annexation" or "[o]rdering the annexation."

---

[13]Government Code section 56319 provides: "In a detachment proceeding, if a majority protest shall not have been filed, the board of directors of the conducting district upon the conclusion of the hearing shall, in accordance with the provisions of Sections 56320 and 56321, adopt a resolution ordering the territory detached."

[14]Government Code section 56319.1 provides:

"In an annexation proceeding, if a majority protest shall not have been filed, the board of directors of the conducting district, not later than 30 days after the conclusion of the hearing, shall adopt a resolution and make one of the following determinations:

"(a) Disapproving the proposed annexation; or

"(b) Ordering the annexation in accordance with Sections 56320 to 56322, inclusive."

The legislative history of DRA reveals that in its original form there was a single section, 56319, dealing with both annexations and detachments and requiring the adoption of "a resolution ordering the territory annexed or detached." (Assem. Bill No. 592, as introduced, Jan. 27, 1965.) The change to the present two sections thus clearly distinguishes detachments from annexations and only in the latter gives any discretion to disapprove proposals which have been approved by a LAFCO. Further legislative history bearing out this interpretation is found in the fact that section 56315, as originally enacted (Stats. 1965, ch. 2043, p. 4709), permitted the conducting district "(b) [t]o exclude any lands proposed to be detached which said board finds will be benefited by remaining a part of said district or improvement district." This power which might have been exercised in a manner inconsistent with the mandate of section 56319 was eliminated by an amendment to section 56315 in 1969 (Stats. 1969, ch. 1301, p. 2548) which deleted the provisions relating to detachment, thereby limiting the power to exclude lands to annexations only.

Likewise consistent with the provision making approval of annexation discretionary but allowing no such discretion with respect to detachments is section 56314.1, which specifies factors to be considered by the boards of directors of conducting districts when passing upon proposed annexations. No such directive exists in respect of detachments for the obvious reason that the conducting district is given no discretion with respect to carrying out detachments.

Petitioners rely upon section 56004 of the Government Code to support their claim that consent of petitioner District was required. The pertinent part of section 56004 is as follows: "Unless otherwise provided by the principal act, any territory annexed to a district shall be contiguous thereto and shall not be a part of another district *formed under the same principal act* without the consent of such other district." (Italics added.) The principal act under which the District was formed was division 5, chapter 4 of the Public Resources Code, section 5780 et seq.

In *Del Paso Recreation & Park Dist.* v. *Board of Supervisors,* 33 Cal.App.3d 483 [109 Cal.Rptr. 169], Government Code section 56004 was held inapplicable to a multidistrict reorganization. However, in dictum the court stated (33 Cal.App.3d at p. 496): "There can be no question that the consent requirement expressed in the final sentence of section

56004 is applicable to instances of simple boundary changes and annexations or detachments affecting . . . but two contiguous districts. Certainly such a proposal ought to and would, under the statute, require the consent of the district losing territory. [Fn. omitted.]"

We find no fault with this dictum but it has no application under the circumstances of this case. Section 56004 is expressly limited in its application to annexation of territory of one district by another district formed under the same principal act. The purpose of this restriction is to curb destructive competition between existing districts offering the same services for territory already included within one of them. No such competition is here involved because there is no district formed under the same principal act proposing to annex the territory. The proposal here involved is designed to avoid the possibility of such a competitive situation in the future.

*The District's Disapproval of the Detachment*
*Is Irrelevant to the Scope of the Election*

Petitioners argue that the provisions of section 56321[15] of the Government Code authorizing the board of directors of the District to determine, in its discretion, the scope of an election and the provisions of section 56320 that "The board of directors may order such territory annexed to or detached from the district either without election or subject to confirmation by the voters upon the question of such annexation or detachment" vest in the board of directors the power to overrule LAFCO's determination limiting the election to the territory to be annexed. This argument totally disregards the provision of section 56321 requiring the District's resolution providing for an election to be made "subject to compliance with any commission order made pursuant to Section 56252." Under the latter section LAFCO was empowered to and did limit the scope of any election which might be called. LAFCO's power in that regard was not made conditional upon the District's later approval of the detachment, particularly in view of the fact that the District had no discretion to disapprove the detachment.

---

[15]Section 56321 provides:

"In any resolution ordering an annexation or detachment of territory subject to confirmation by the voters, the board of directors, *subject to compliance with any commission order made pursuant to Section 56252*, may provide for an election or elections to be called, held and conducted upon such question:

"(a) Only within the territory ordered to be annexed or detached; or

"(b) Both within the territory ordered to be annexed or detached and within all or such part of said district as is outside of such territory." (Italics added.)

*LAFCO's Approval of the Detachment Was Not
Invalidated by Failure to Complete a Sphere
of Influence Plan, Including a Specific
Sphere of Influence for Petitioner District*

Petitioners' ninth cause of action alleged that respondent LAFCO acted in excess of jurisdiction "by approving the detachment of the property described above prior to determining the spheres of influence for the Petitioner District and other local governmental agencies adjacent to it in accordance with Government Code Section 54774." No further materials were supplied by petitioners elaborating upon this claim. It appears that the objection relates specifically to the failure to establish a sphere of influence for petitioner District as such. As noted by our Supreme Court in *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 268-269:

"In 1967 LAFCO considered the development of 'spheres of influence' for Ventura County, held public hearings and eventually, in January 1968, adopted a 'spheres of influence plan.' Later, effective 1972, the Legislature amended the Knox-Nisbet Act to require that each LAFCO develop a spheres of influence plan. (Gov. Code, § 54774.)

"Under the 1968 spheres of influence plan, Kaiser's property straddled the Las Posas and Camarillo spheres of influence. Las Posas then was, and still is, an unincorporated area. In August 1970 Kaiser was planning to develop property which included the Bell Ranch and requested LAFCO to readjust the spheres of influence. This was the first official notice that Kaiser intended to subdivide the ranch. In September 1970, after hearings, LAFCO approved a shift of the spheres of influence lines so that the Bell Ranch property fell into the Las Posas sphere."

As above pointed out, the occasion for the proposal to detach 10,000 acres from petitioner District was another approved shift in the spheres of influence lines established by the Ventura County "spheres of influence plan," affecting only the line between the Simi Valley sphere and the Moorpark sphere. The new sphere of influence line, as depicted on Appendix B to respondents' memorandum, coincides with the easterly boundary of the area to be detached, and all territory between such line and the Los Angeles-Ventura County line is in the Simi Valley sphere of influence, the boundaries of which for the most part coincide with the boundaries of petitioner District. Thus, if respondent LAFCO

has failed to establish a sphere of influence specifically delineating the District's sphere in all directions, its action redrawing the sphere of influence lines between Moorpark and Simi Valley effectively determined the westerly limit of the District's sphere by placing the area to be detached in the Moorpark sphere for which there was a general plan integrating the area into its park and recreation element.

Section 54774 of the Government Code, as amended in 1971, does mandate the establishment of a plan determining the sphere of influence "of each local government agency within the county." The purpose of this action, however, is to carry out LAFCO's "responsibilities for planning and shaping the logical and orderly development and coordination of local government agencies . . . ." To this end section 54774 mandates use of the spheres of influence as a factor in making decisions on proposals under the jurisdiction of LAFCO.

Under the circumstances it would exalt form over substance to invalidate respondent LAFCO's determination because other perimeters of the District's sphere have not been precisely defined when the western boundary of such sphere has by necessary implication been defined by LAFCO's action creating the new sphere of influence line between Simi Valley and Moorpark.

*Decisions of Respondent LAFCO and of Respondent*
*Board Are Reviewable Only to Determine if*
*They Are Supported by Substantial Evidence*

By their 11th cause of action, petitioners sought to invoke the "independent judgment" of the court to find an abuse of discretion because the determinations of respondent LAFCO and of respondent Board "are not supported by the weight of the evidence." By their demurrers respondents sought a determination that as a matter of law such standard of review was not applicable. The trial court did not decide this legal question but instead sustained the demurrer on a ground unrelated to the scope of review. This disposition of the matter was unfortunate but it does not interfere with a proper disposition in this court of the legal question presented and an affirmance of the judgment if the demurrer was well taken.

" 'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety,

than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)" (*D'Amico* v. *Board of Medical Examiners,* 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10]; see *Davie* v. *Board of Regents, etc.,* 66 Cal.App. 693, 702 [227 P. 243], for the application of this rule to grounds for sustaining demurrers.)

▮ The scope of review of determinations made with respect to proposals for changes of organization pursuant to the DRA is set forth in Government Code section 56006, which provides in pertinent part: "All determinations made by a commission or by any legislative body under and pursuant to the provisions of this division shall be final and conclusive in the absence of fraud or prejudicial abuse of discretion. In any action or proceeding to review any quasi-judicial determination made by a commission or by a legislative body the sole inquiry shall be whether there was fraud or prejudicial abuse of discretion. Prejudicial abuse of discretion shall be established if the court finds that any determination of a commission or a legislative body was not supported by substantial evidence in light of the whole record."

Section 56006 expressly makes applicable the substantial evidence standard for review of both respondent LAFCO's and respondent Board's determinations. Petitioners rely upon *Strumsky* v. *San Diego County Employees Retirement Assn., supra,* 11 Cal.3d 28 [112 Cal. Rptr. 805, 520 P.2d 29], as authority for their claim that the independent judgment standard of review is applicable despite the express provisions of section 56006 of the Government Code. The rule of *Strumsky* is stated therein as follows (11 Cal.3d at pp. 44-45):

"The effect of this conclusion upon the question immediately before us is clear. Because judicial powers may no longer be exercised by 'local agencies,' the factual findings of those agencies are entitled to no greater deference than those of other agencies lacking judicial powers under the Constitution. Accordingly we conclude that the rule of review which was reaffirmed by us in *Bixby* v. *Pierno, supra,* for application to adjudicatory decisions by legislatively created agencies of statewide jurisdiction is equally applicable to decisions by 'local agencies' as well.

"We therefore hold that in all such cases, if the order or decision of the agency substantially affects a fundamental vested right, the court, in determining under section 1094.5 of the Code of Civil Procedure whether there has been an abuse of discretion because the findings are not supported by the evidence, must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. If, on the other hand, the order or decision does not substantially affect a fundamental vested right, the trial court's inquiry will be limited to a determination of whether or not the findings are supported by substantial evidence in light of the whole record. So that there will be no misunderstanding, we emphasize that this rule shall apply to all pending and future proceedings in trial courts and all pending and future appeals."

Two factors must coincide before the independent judgment test announced in *Strumsky* is applicable. The local agency must be exercising judicial powers and the decision must substantially affect a fundamental vested right. Neither factor is present in this case.

In making its determination approving the detachment of territory from petitioner District, respondent LAFCO exercised a legislative function, not a judicial one. Petitioners themselves have so argued in support of their claim of unconstitutionality on the basis of impermissible delegation of legislative authority. In *Bookout* v. *Local Agency Formation Com.,* 49 Cal.App.3d 383 [122 Cal.Rptr. 668], the argument was made that LAFCOs do exercise a quasi-judicial function. In rejecting this claim the court said (49 Cal.App.3d at pp. 387-388): "Respondent argues that LAFCO in fact does exercise a quasi-judicial power in discharging its statutory responsibilities. (See §§ 54790 (general powers and duties), 54796 (factors to be considered).) The contention is without merit. This argument was inferentially answered in *City of Ceres* v. *City of Modesto* (1969) 274 Cal.App.2d 545 [79 Cal.Rptr. 168], where this court said at page 550: 'A local agency formation commission, commonly referred to as LAFCO, is a creature of the Legislature and has only those express (or necessarily implied) powers which are specifically granted to it by statute. In short, LAFCO is a public entity created by legislative fiat, and like similarly constituted public entities is a body of special and limited jurisdiction [citation]. Thus, we must look to chapter 6.6 of division 2 of title 5 of the Government Code (the enabling act under which LAFCO was formed) for the answer to our questions. The pertinent sections of this chapter and division are sections 54774, 54775,

54790, 54791, 54792, 54796 and 54799.' and at page 553: 'It is eminently clear, from a careful reading of section 54774, that LAFCO was created by the Legislature for a special purpose, i.e., to discourage urban sprawl and to encourage the orderly formation and development of local governmental agencies. In short, LAFCO is the "watchdog" the Legislature established to guard against the wasteful duplication of services that results from indiscriminate formation of new local agencies or haphazard annexation of territory to existing local agencies.' Thus, in the processing of annexation petitions and determination of municipal boundaries in accord with statutory mandate, LAFCO is merely a creature of the Legislature, exercising a legislative function. (See also *Meyers* v. *Local Agency Formation Com.* (1973) 34 Cal.App.3d 955, 959-961 [110 Cal.Rptr. 422].)"

The first requirement for application of the independent judgment rule under *Strumsky* is therefore not met in respect of the determination of respondent LAFCO. No further discussion is required in respect of any determination of respondent Board inasmuch as its action, as above pointed out, was purely ministerial in view of the mandatory nature of LAFCO's determination.

The second factor, substantial effect upon a fundamental vested right, is also absent. In *People* v. *City of Palm Springs,* 51 Cal.2d 38, 47 [331 P.2d 4], our Supreme Court said: "No one has a vested right to be either included or excluded from a local governmental unit (*Peart* v. *Board of Supervisors,* 145 Cal.App.2d 8, 11 [301 P.2d 874]), and the fixing of territorial boundaries of a municipal corporation will not ordinarily constitute an invasion of federal constitutional rights. (*Hunter* v. *City of Pittsburgh,* 207 U.S. 161, 178-179 [28 S.Ct. 40, 52 L.Ed. 151]; *Forsyth* v. *Hammond,* 166 U.S. 506, 518 [17 S.Ct. 665, 41 L.Ed. 1095]; *Kelly* v. *City of Pittsburgh,* 104 U.S. 78, 80-81 [26 L.Ed. 658].)"

Similar observations appear in *Weber* v. *City Council, supra,* 9 Cal.3d 950, 957, where the court said: " 'Municipal corporations are political subdivisions of the state. Subject only to its own laws and constitution, the state may create, expand, diminish, or abolish such subdivisions, and "all this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest." (*Hunter* v. *Pittsburgh* (1907) 207 U.S. 161, 179 [52 L.Ed. 151, 159, 28 S.Ct. 40]; see *San Francisco* v. *Canavan* (1872) 42 Cal. 541, 557-558.)' (*Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942, 951 [104 Cal.Rptr. 297, 501 P.2d 537].)"

In *Bookout* v. *Local Agency Formation Com., supra,* 49 Cal.App.3d 383, the court relied upon the decision in *People* v. *City of Palm Springs,* 51 Cal.2d 38 [331 P.2d 4], as authority for its statement as follows: "[B]ecause the annexation does not deprive the owners of the annexed area of property or property rights in the constitutional sense, the Legislature could have totally omitted provisions for any notice or hearing and empowered a municipality to initiate and complete annexation without notice. (*People* v. *City of Palm Springs, supra,* 51 Cal.2d at pp. 47-48.)" (49 Cal.App.3d at p. 387.)

The demurrer to petitioners' 11th cause of action was, therefore, properly sustained. Even assuming the determinations made were not supported by the weight of the evidence, that fact would not invalidate them.

Ordinarily an order sustaining a demurrer on the grounds urged by respondents would include leave to amend, and it would be error to deny such leave. The particular circumstances of this case, however, fully set forth above, indicate a contrary conclusion. The parties had stipulated to a bifurcation of the hearing and a determination of the questions of law in advance of other issues on the ground that the legal issues might resolve the case. When the court failed to determine the proper scope of review, petitioners conceded in their memorandum in support of their motion to file the transcript that the transcripts would not have been relevant had the court ruled "that the *Strumsky* test was not applicable." This could only mean that the transcripts failed to support a claim that the determinations were not supported by substantial evidence. The significance of this concession is made even more clear by petitioner's requesting leave to amend to incorporate the transcripts but omitting any request to state that the determinations were not supported by substantial evidence.

Even in their briefs on appeal petitioners omit any assertion or demonstration that the determinations were not supported by substantial evidence. Under the circumstances, petitioners have not shown that the denial of leave to amend was an abuse of discretion. In *Burling* v. *Newlands,* 112 Cal. 476, 499-500 [44 P. 810], our Supreme Court said:

"Appellants have made no point in the argument upon the refusal of leave to amend, probably for the reason that they have never specified either in the superior court, or in this court, any amendment that they could make, or that they desired to make.

"In the absence of such a specification it cannot be held that the superior court abused its discretion in denying leave to amend. (*Martin v. Thompson*, 62 Cal. 619.)"

*Disposition*

The judgment is affirmed.

Cobey, Acting P. J., and Allport, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 4, 1976.